2b 397
29ap251

THE PEOPLE, *ex rel.* Benjamin Griffin, *vs.* WILLIAM STEELE and others, Trustees of the Centenary Methodist Episcopal Church in the city of Brooklyn.

Courts can only inquire into the tenets promulgated in a particular church, in connection with a right of property, or a trust to be administered.    They have no power to determine as to the scriptural truth of those tenets.

Where the fact as to the diversion of church property is in question, the limit of the inquiry is whether there has been an appropriation of property for the support of a church in which certain religious doctrines should be taught, and a certain discipline observed.    If so, and those objects are not contrary to law, the next inquiry is whether there has been an attempt to withhold the property, and withdraw it, from the uses to which it was dedicated; and whether the persons in possession of such property adhere to the doctrines it was given to sustain.

The intention of the donors is the criterion by which to determine the purposes to which the property of a church has been dedicated.

If the grant expresses that intention clearly and unequivocally, that must govern. But where the conveyance is merely to the religious corporation, by name, with no other designation of its purposes or trusts, the corporate or denominational name, in connection with the contemporaneous acts of the corporators, may be a sufficient guide as to the nature of the trust.

The itinerancy of the priesthood, enforced by the power of the episcopacy, is the established practice of the Methodist Episcopal Church; and the right of the bishops to appoint preachers for the different churches is well settled.

Where a congregation was organized, and its house of worship dedicated, with a view to the preaching of the faith, and enforcing the discipline of the Methodist Episcopal Church; and it was the intention of its founders to establish a Methodist Episcopal Church in connection with the general church of that

The People *v.* Steele.

denomination, and to support the tenets of that church, in subjection to the ecclesiastical power thereof; *Held* that the refusal of the trustees to receive a preacher appointed by the bishop was an act of insubordination to the ecclesiastical tribunals of the church, and in violation of one of the injunctions of its discipline; which authorized the issuing of a peremptory mandamus, commanding them to admit the preacher thus appointed, into the church.

The great and paramount duty of trustees of religious corporations, is to see that the temporalities committed to their charge are fairly and fully devoted to the purposes which the founders had in view. All authority conferred upon them is necessarily subordinate to this great end; and all exercise of it beyond the legitimate attainment of this end is usurpation.

It is no excuse for any aberration from the line of their duty, for such officers to say that they have been directed to it, or are sustained in it, by a majority of those to whom they owe their appointment.

It is the duty of courts of law to enforce the performance of their duty by trustees of religious corporations; unless that performance involves some violation of the law of the land.

The writ of *mandamus* is proper wherever some legal right has been refused or violated, and there is no other appropriate legal remedy.

So far as regards inferior judicial tribunals, the operation of the writ of mandamus, in this state, is confined simply to a mandate that they proceed. But as to corporations, and ministerial officers, it is competent for this writ not only to direct them to act, but to prescribe the mode in which they shall act.

As respects corporations, and ministerial officers, the existence of another and an adequate remedy, against them, is no objection to awarding a mandamus.

A writ of mandamus is the proper remedy to put a minister of any religious sect in possession of the pulpit to which he is entitled; notwithstanding such pulpit is occupied by another person.

IN 1839, the members of three Methodist churches in Brooklyn united in forming a new church, which they denominated the Centenary Methodist Episcopal Church, in commemoration of the centenary of methodism. They caused themselves to be incorporated under our general act as to religious corporations, and by voluntary contributions among the members of that persuasion at large, built themselves a meeting house and parsonage. They were admitted into the connection with other churches of that denomination, by the presiding elder of that district, and, agreeable to their discipline, received from him a preacher. For a period of about eight years, they received annually from the conference a preacher appointed for them by the bishop. In 1847, their preacher having been suspended

The People *v.* Steele.

by the authorities of the church, the congregation determined to stand by him. They accordingly notified the bishop that they did not desire him to appoint a preacher for them, and they agreed with their then preacher to continue him as their pastor, at a salary of one thousand dollars, and rented him the parsonage.

The bishop, disregarding their notification, and pursuing the accustomed practice, appointed the relator, the Rev. Mr. Griffin, an ordained elder of the church, to be their preacher. Mr. Griffin was refused admittance into the church by the trustees. He then applied for an alternative mandamus, commanding them to admit him, or show cause why they did not. The trustees made their return to the writ, setting up as the main ground of their defence, that Mr. Griffin, the appointee of the bishop, was not the choice of the majority of the congregation, but that Mr. Green, their suspended preacher was, and claiming that the voice of that majority should control. On the coming in of that return,

*Asa Child & D. Lord, Jun.* for the relator, moved for a peremptory mandamus, because of the insufficiency of the cause shown. They made the following points.

I. As to what papers are properly before the court. (*See The People* v. *Brooklyn*, 1 *Wend.* 31; *Same* v. *Del. Com. Pleas*, 2 *Id.* 255; *Same* v. *Com'rs of Hudson*, 7 *Id.* 474.) The original papers are before the court, not as *evidence*, but to show the purport of the proceedings, and the intent of the parties to them. II. Upon the *writ* and *return*. The *writ* performs the office of a declaration. The *return*, the office of a plea. (*Comm. Bank of Albany* v. *Canal Com'rs*, 10 *Wend.* 25, 31.) The relator's case shows six positions: (1.) The M. E. Church is a church or denomination composed of individuals, men and women, associated as members thereof in numerous societies, in conformity to certain rules of discipline and laws denominated "the doctrines and discipline of the Methodist Episcopal Church," which contain the doctrines and discipline of government of said Methodist Episcopal Church.

(2.) The provisions of said discipline are set out, and the writ shows what the government of the church is *according to said rules of discipline*, that is, to say, as in the writ stated. (3.) The society in question was organized in 1839, as a society of the M. E. Church, in conformity to its discipline, and became a society subject to its laws; and so being a society of the M. E. Church, the defendants became and were incorporated as its trustees. (4.) The society procured the meeting house and parsonage, and they were vested in the defendants, for the society, as one of the societies of the M. E. Church, to be used as such, and were taken possession of as such. (5.) The pastorship is an office to which there is attached a benefit; and Griffin, according to the law creating the benefit, was appointed to the office. (6.) The defendants have refused to admit him to the office and benefits. (*See* 3 *R. S.* 208, §§ 3, 4.) To the writ containing these provisions which have been previously determined by the court, (*Spencer, J.* 12 *John. Rep.* 414,) this return is no answer. III. The return, to be valid, must be *certain, direct, positive*, and contain by clear averments, all the facts necessary to justify a refusal to obey. It must be as certain as an *indictment* or a return to a *habeas corpus*. (*King* v. *Lyme Regis, Doug.* 149, 153, 154, 148, 157, 177, 181. *King* v. *Liverpool*, 2 *Burr.* 722, 731. *Bagg's case*, 11 *Coke*, 93. *King* v. *Alington*, 1 *Lord Raym.* 559, 560. *King* v. *Doncaster*, 2 *Burr.* 738, 741. *King* v. *York*, 5 *T. R.* 66, 74, 69. *King* v. *Cambridge*, 2 *Id.* 456, 458.) As to the motion to quash the return. (*The People* v. *Com'rs of Hudson*, 6 *Wend.* 559. 5 *T. R.* 66. 13 *Wend.* 665, *note*. 4 *Cowen*, 403. 1 *John. Rep.* 64.) This return is bad, because it undertakes to traverse the relator's title as stated in the writ, and *also* to assign by new facts, reasons for not obeying the writ. (10 *Wend.* 25.) It is *evasive*. It does not meet any one of the first five positions of the relator's case, either by a direct traverse, or by any positive averment in avoidance. It is deceptive, uncertain, and inconsistent. The following are cases of returns to writs of mandamus. (*King* v. *Mayor of York*, 5 *T. R.* 66. *King* v. *Mayor of Hereford*, 6 *Mod.* 309,

cited 5 *T. R.* 74. *Queen* v. *Mayor of Norwich,* 2 *Ld. Raym.*
1244. 2 *T. R.* 459. *King* v. *Corp. of Malden,* 1 *Ld. Raym.*
481. *King* v. *Lyme Regis,* 1 *Doug.* 79, 85. *King* v. *Mayor
and Corp. of Liverpool,* 2 *Burr.* 723, 731. *King* v. *Mayor
of Doncaster, Id.* 738. *King* v. *Mayor of Cambridge,* 2 *T.
R.* 456, 458. *King* v. *Mayor, &c. of Doncaster,* 2 *Ld. Raym.*
1564. *King* v. *Same, Sayer,* 37. *King* v. *Stewards of Com.
of Fishermen,* 8 *T. R.* 352.) IV. The writ of mandamus is
the proper remedy in this case. (*People* v. *Super. Ct. of N.
Y.* 5 *Wend.* 114, 128. *King* v. *Barker,* 3 *Burr.* 1265. *Doe*
v. *Jones,* 5 *Man. & Ryl.* 752. *Ex parte Nelson,* 1 *Cowen,*
417, 423. *People* v. *Supervisors of Albany,* 12 *John.* 414.
*King* v. *Blooer,* 2 *Burr.* 1043. *King* v. *Jotham,* 3 *T. R.* 575.
*King* v. *Turkey Co.* (*a company of merchants,*) 2 *Burr.* 942.
*King* v. *Com'rs of Land Tax,* 1 *T. R.* 146. *Runkel* v. *Wine-
miller,* 4 *Har. & McHen.* 429, *recognized in* 12 *Pet.* 620.
*Brosius* v. *Reuter,* 1 *Har. & John.* 480. 7 *Serg. & Rawle,*
517, 564. *Angel & Ames on Corp.* 429, 435, 437. 2 *N. Y.
Legal Observer,* 176. 20 *Pick.* 484. 6 *Dane's Ab. tit. Man-
damus.* 3 *Hen. & Munf.* 1.)

*J. Dikeman & J. Greenwood,* for the defendants.

I. A mandamus does not lie to settle a disputed question as
to the right to an office or place. It lies only to enforce the
performance of a mere ministerial duty. (*People, ex rel. Hodg-
kinson,* v. *Stevens,* 5 *Hill,* 619. *People* v. *Corporation of N.
York,* 3 *John. Cas.* 79. *King* v. *Mayor of Colchester,* 2 *D. &
E.* 259. *Matter of Union Ins. Co.* 22 *Wend.* 596.) II. And
if there be a person in possession of the office or place claimed,
he must always be made a party. (5 *Hill,* 629, 630. *Rex* v.
*Banks et al.* 3 *Burr.* 1452 ; 1 *W. Bl.* 445, *S. C. Cowp.* 507.)
The trustees could not, on this mandamus, eject Green from the
pulpit and parsonage. III. The relator must have the legal
temporal right to the place in question, to entitle him to this
writ. (*Rex* v. *Barker et al.* 2 *Burr.* 1265. *Porter et al.* v.
*Clark et al.* 2 *Sim.* 520.) IV. The deed by which the title to
the temporalities is held by the defendants, creates no right in

The People *v.* Steele.

favor of the relator. V. The alleged use or trust, under which the relator claims, is contrary to the policy of the laws of this state, and void. (3 *R. S.* 207, § 3. *Methodist Church* v. *Remington,* 1 *Watts,* 218.) If it is not void, the facts of this case do not warrant the establishment of any such use or trust here. VI. A court of law has no jurisdiction to establish a pious or religious use or trust. (*Field* v. *Field,* 9 *Wend.* 394.) And see all the church cases in the courts of this state. Even courts of equity do not interfere with the ecclesiastical government of churches. VII. The defendants being a church, incorporated under the general act, and the title to the temporalities being unconditionally vested in them, the congregation have the exclusive right to employ a minister. (*Baptist Church* v. *Witherell,* 3 *Paige,* 303, 304. *Bowden* v. *McLeod,* 1 *Edw. Ch.* 592. *Trustees of Organ Meeting House* v. *Seaford,* 1 *Dev. Eq.* 453. *Stebbins* v. *Jennings,* 10 *Pick.* 172.)

EDMONDS, J. I confess that there is much in this return, which would, from a mere cursory perusal, go far to at least excuse the charge of evasion and inconsistency which was so vehemently made against it on the argument, by one of the counsel for the relator. If there was enough to warrant me in declaring the charge fully made out, it would be my duty for that cause alone to decide this motion in favor of the relator, and to direct a peremptory mandamus to issue to admit him to the pastorship of this church. But I cannot readily bring myself to believe that either of the respectable parties to a controversy so important as this is, would desire to have it determined otherwise than upon its substantial merits, or be willing to have the task of deciding it embarrassed by mere technicalities or useless special pleading. And as I imagine I can perceive a distinction pervading the whole return, which involves the merits, and takes from it its imputed character of evasiveness and inconsistency, I prefer looking at it in that aspect, that I may approach the more agreeable duty of attempting to decide the case according to the very right of it. That distinction is this. The relator, in his writ and in his other proceedings,

The People *v.* Steele.

uses the word "church" in various significations: at one time
as denoting the whole Methodist persuasion in the United
States; at another, that portion of it which is represented in
their conferences; at another as the particular society or con-
gregation over which he claims to be pastor; and again as
designating their meeting house, or house of worship; while the
respondents, on the other hand, intend to use it in one sense
only, that of designating this particular congregation.   Hence,
when the relator alleges that "the Methodist Episcopal Church
in the United States is a church or denomination of Christians
voluntarily associated in numerous societies," in conformity to
certain rules which contain the doctrines and discipline of the
said Methodist Episcopal Church, the respondents feel them-
selves at liberty to deny that there is any such church known
to or in the law of the land as the Methodist Episcopal Church
in the United States; while they admit that there is an asso-
ciation of ministers or preachers who are known by that name
and governed by those rules.   And while they "deny that the
several societies or churches within the limits of the several an-
nual conferences are associations united as parts of one com-
mon church," they admit, that "by said rules, in the general
conference, alone, is vested the authority to prescribe or change
the rules of said Methodist Episcopal Church, and to ordain
laws binding on its members."   And so, while they deny that
the persons composing this society, were at the time of the for-
mation thereof, members of any church known as the Metho-
dist Episcopal Church, "they aver that it was composed of
persons who were then members of the First, Second, or Third
Methodist Episcopal churches in the city of Brooklyn, which
said three last mentioned churches were separate and indepen-
dent churches, in no ways connected with each other or with
any other church."  If the respondents had contented them-
selves with this distinction and had based their return solely
on that, I should have been obliged to hold it evasive; because
it is most manifest that they have not answered to the word
"church" in the sense in which it is understood in common
parlance among that denomination of Christians, nor in the

sense in which it was plainly used in the writ which they were answering to. But they have gone farther; and while throughout they have adhered to this distinction as perhaps a legitimate mode of presenting to the court the grounds on which they intend to rest their defence, they have, in other parts of their return, as well as on the argument, so frankly spread out the facts of the case, as to present no insuperable obstacle to a decision on the substantial merits of the controversy.

Those merits are presented in this simple form: On the one hand, it is claimed that the power of appointing a preacher to any particular congregation, (involving herein both the duty of the preacher thus to officiate and the obligation of the congregation to receive him,) is vested in certain constituted authorities of the church at large, irrespective either of the wishes of the pastor or congregation; and, on the other hand, it is insisted that this is an obligation resting on the preachers alone, and not on the congregation; that this obligation springs only out of a discipline of government adopted and prescribed by the preachers alone, and while it obliges them to go where the superior authority directs them, no congregation is bound to receive them as their pastors, except of their own free choice.

The consideration of this question presents for my determination two points: 1. The nature and extent of the obligation resting on the respective parties: 2. How far it is the duty, or in the power of courts of law to enforce this obligation, whatever it may be. In discussing these questions I disclaim at the outset, all power to canvass or determine the scriptural truth of any tenet held by this denomination of Christians, or any individual or congregation among them. I can only inquire into the tenets promulgated in the church, in connection with a right of property, or a trust to be administered. The limit of the inquiry is this: has there been an appropriation of property for the support of a church in which certain religious doctrines should be taught, and a certain discipline observed? If so, and these objects are not contrary to law, then the next inquiry is, whether there has been an attempt to withhold the property from the uses to which it was dedicated, and whether

those who now participate in the avails of the property adhere to the doctrines it was given to sustain ?   My province is merely to ascertain what are, and not what ought to be, the tenets and discipline of this class of Christians, and that only for the purpose of ascertaining whether the " meeting house" and parsonage in dispute, have been dedicated to their support, and whether the acts of the respondents, the trustees, are calculated to withdraw them from the purposes to which they have been dedicated.   The intention of the donors is the criterion by which to determine those purposes.   The grant frequently expresses it, and when it does so, clearly and unequivocally, that must govern.   But in this case, the conveyance is merely to the religious corporation by name, with no other designation of its purposes or trusts.   In such cases, in the language of Judge Gardiner, in *Miller* v. *Gable*, (2 *Denio*, 548,) the corporate or denominational name, in connection with the contemporaneous acts of the corporators, may be a sufficient guide as to the nature of the trust.   Here the corporate name in the deed is " The Centenary Methodist Episcopal Church," &c. ; three words of which clearly having respect to " doctrines esteemed fundamental."   The contemporaneous acts of the corporators are equally significant.   The congregation was formed in the first instance of members of three other Methodist Episcopal churches.   Upon their application, they were organized and recognized as a Methodist Episcopal church by the presiding elder of that district, in the absence of the bishop, and in the interval of the annual conference.   They received from him the assignment of a preacher, who officiated for them till the next annual conference ; and thence forward for a period of nearly eight years, and up to the time when this difficulty occurred, they yearly received from the conference such pastor as the presiding bishop designated.   They became incorporated as a Methodist Episcopal church.   When they contemplated erecting their buildings, they obtained subscriptions for the purpose of aiding them (the trustees) in building a " Methodist Episcopal Church ;" and they now admit in their return that they built the meeting house " as and for a

The People *v.* Steele.

house of worship, to be held and used as a Methodist Episcopal meeting house, according to the discipline of the Methodist Episcopal church ; so far as the said discipline relates to the articles of religion and the conduct and government" of the members thereof, as far as the same may be consistent with their legal rights as a religious corporation.

These circumstances show to my mind very satisfactorily that this particular congregation was organized, and this church dedicated, with a view to the preaching of the faith and enforcing the discipline of the Methodist Episcopal persuasion, and that it was the intention of the founders thereof to support its tenets in subjection to the ecclesiastical power which upholds those tenets. It was undoubtedly competent for the original founders of this " Centenary Methodist Episcopal Church" to have established it, independent of any connexion with any other professing Christians of the same denomination, and to have dedicated it to the support of particular tenets, independent of any particular form or mode of church government. Such a congregation might afterwards form a union with others, and again dissolve it, without impairing their foundation or doing more, by the dissolution, than simply restoring themselves to their former position. But there is a wide difference between such a church and one originally formed as a branch of a main body, and in subordination to its church government and discipline, from which it cannot break off without losing its distinctive character. I entertain no doubt that the church in question was of the latter character. Every allegation and admission in the papers before me show this, and evince that the independence now claimed for it by these trustees, was an after thought, not entering into the calculation of the original founders, but springing from some subsequent considerations which may or may not justify the separation of this branch from the main stock.

Whether the acts of the trustees now complained of, and sought to be redressed in these proceedings, tend to such a separation, or if they do, whether they rest on considerations sufficient to justify it in any respect or to any extent, are next to be

ascertained.   The claim set up by these trustees is, I repeat, that their society, in respect to receiving preachers, is independent of the higher church authorities, and that it is optional with them, whether they will receive such as the bishop or the presiding elder at the annual conference shall appoint for them. If this may be predicated of this congregation, it may be so of every other society of the Methodist Episcopal Church in the United States.   And the true inquiry is, whether the independence thus claimed for all the separate congregations of the Methodist Episcopal denomination is consistent with the rules and discipline of the main body of which they are component parts, and consonant to the church government in subordination to which they were originally established?   This question is by no means new to that church, nor is this the first time it has agitated its members.   It is now a little over one hundred years since Methodism first took its rise in England, under the fostering care of John Wesley, an ordained minister of the Protestant Episcopal Church of England, and about eighty years since it was first introduced into America, and began its extraordinary career among our people.   For more than fifty years of that time, the question now mooted before me, has been once and again agitated in its councils, but it has never till now, that I can learn, invoked the interposition of the legal tribunals of the country.   It seems, from an early period of his labors, to have been a cardinal principle with Wesley, that the preachers, whom he sent abroad to diffuse his doctrines among men, should be independent of the people whose sins they were to condemn, and whose consciences they were to awaken, and that they should not be seduced from the apostolic task, severe and full of privation and self-denial as it was, to which they were dedicated, by the seductions of a permanent residence or the allurements of an abiding home.   Hence arose what, in their language, is called the "itinerancy" of their preachers, meaning thereby, that no preacher having charge of a congregation should remain at any one place longer than a brief period, ranging at different times from three months to three years.   Without yielding to the temptation of pausing to comment on the wis-

dom of a measure which has doubtless been one great element of the extraordinary success which has attended the preaching of these doctrines in this country, swelling that denomination of Christians here, in the space of eighty years, from less than a score of people to nearly a million, and which has sent their tenets forth into the wild and waste places of a new land as co-travellers with, if not forerunners of, the hardy pioneers of the west, I pass to the remark that this duty of assigning the preachers was, in the early years of the church, exercised by Wesley himself, both in this country and in England. In 1769 he sent over to America two persons, who were the first regular itinerant Methodist preachers who visited this country. In 1771 he sent over two more, one of whom, Mr. Asbury, in 1772, received from him an appointment as "general assistant," which meant that as Wesley was considered as head of the whole body, both in Europe and America, the one having a circuit under him was styled his assistant, and those under the assistants were styled helpers; so Mr. Asbury, as "general assistant," was constituted the head of all the preachers and societies in America, with power to station the preachers, &c. under the general direction of Wesley himself. From that time until his death, in 1816, a period of forty-four years, with some slight interruptions, when the authority of his office was exercised by some other person, the power of stationing the preachers in this country was exercised by Mr. Asbury as such general assistant, or as superintendent or bishop, or by persons appointed by him, or by him and his coadjutors in the episcopacy. In 1789 a controversy arising from the question now before me, sprung up in England in what is known in their history as "the case of Birstal House." In Wesley's account of that matter he says: "I built the first Methodist preaching house at Birstal, in 1739, and knowing no better I suffered the deed of trust to be drawn up in the Presbyterian form, but Mr. Whitefield hearing of it, wrote me a warm letter asking, "Do you consider what you do? If the trustees are to name the preachers they may exclude even you from preaching in the house you have built. Pray let this deed be immediately cancelled."

The People v. Steele.

To this the trustees readily agreed. Afterwards "I built the preaching houses in Kingswood and at Newcastle-upon-Tyne. But none besides myself had any right to appoint the preachers in them." He also says that " whenever the trustees exert the power of placing and displacing preachers, then itinerancy preaching is no more. When the trustees in any place have found and fixed a preacher they like, the rotation of preachers is at an end; at least till they are tired of their favorite preacher, and so turn him out. While he stays is not the bridle in his mouth ? How does he speak the full and the whole truth, since whenever he displeases the trustees he is liable to lose his bread ? How much less will he dare to put a trustee, though ever so ungodly, out of the society ?" And in 1782 he used this explicit language: " I abhor the thought of giving to twenty men the power to place or displace the preachers in their congregations. How would he then dare to speak an unpleasing truth ? And if he did what would become of him ? This must never be the case while I live among the Methodists. And Birstal is a leading case, the first of an avowed violation of our plan. Therefore the point must be carried for the Methodist preachers now or never; and I alone can carry it, which I will, God being my helper."

Wesley seems to have been loathe to sever the connection between his followers and the Church of England, and it was not until after the revolutionary war had dissolved all political ties between his country and ours, that he could be induced to exercise the power of ordaining ministers for his followers in this country. But in 1784, he appointed Dr. Coke and Mr. Asbury to be "joint superintendents over the brethren in America."

Whether this word, derived from the Latin *super*, and *intendere*, or the Greek *episkopos*, or the more English phrase bishop, derived from the Saxon *bircop* be used, the meaning of all is the same, to oversee. Connected with the office of bishop in the church of which he was a member, was the power of presentment of pastors to congregations, except where the power had been specially granted otherwise. Connected with the

The People *v.* Steele.

office of superintendent, which he created for his followers in America, was the like power of stationing ministers. In neither instance was there any power in the congregation to choose their pastor or preacher.

When the missive bearing this appointment from the great head and founder of this church reached these shores, sixty out of the eighty-three preachers then in the travelling connexion, assembled in conference; in their own language became, instead of a religious society, a separate church; elected and ordained their bishops; declared their articles of religion, and established their discipline—a part of which, affecting the question in hand, was the following: Quest. 2. How is a bishop to be constituted in future? Ans. By the election of a majority of the conference, and the laying on of the hands of a bishop. Quest. 3. What is his duty? Ans. To preside as moderator in our conferences; to fix the appointments of the preachers for the several circuits; and in the intervals of the conferences, to change, receive, or suspend preachers, as necessity may require, &c. The power thus conferred on the bishop or superintendent, has been thus exercised by those officers, or by persons appointed by them among that denomination of Christians in this country, from that time until the present. But in this country, where the practice of self-government has been attended with such happy results, and where it has been so habitual in all the relations of life as almost to become a part of our nature, it was not to be expected that the establishment of a hierarchy like this, embracing within its authority so many thousands of our intelligent citizens, would be permitted without a struggle. Hence the history of this church is full of the efforts to overthrow or at least to modify it. At the first regular general conference, (which is the highest ecclesiastical tribunal among them, and which was held in 1792,) it was proposed to give an appeal from the bishops in stationing the preachers, to the conference. After "a very strong debate," as it is termed, which lasted three days, the proposition was rejected by a large majority. A secession from the church followed, and for a few years its onward progress was arrested.

At the general conference in 1800, several propositions of a similar character were made. One " that the new bishop bring the stations of the preachers into the conference, that he may hear what the conference has to say upon each station." Another, " that the new bishop in stationing preachers, be aided by a committee to be chosen by the conference." But all were either withdrawn or rejected ; the conference determining that the new bishop should be clothed with all the powers which had been conceded to his senior. The same attempt, in a different form, was made at the general conferences held in 1808, 1812, and 1816. The form the proposition then assumed was, for the conferences to elect the presiding elders, who should constitute a council to assist the bishop in stationing preachers. But it was again rejected. The same proposition was renewed in 1820 and again rejected. In a modified form it was finally adopted, but its operation was suspended until the next general conference, at which it was again suspended for four years more ; and finally in 1828 was rescinded. Thus ended, for the time, a controversy which the historian of the church describes as one " which has caused more agitation in our church, and sometimes seemed to threaten more disastrous consequences than any other which up to that time had been canvassed on the floor of the general conference." In 1840 the question was again agitated, though more moderately, on a petition, among other things, for the election of presiding elders, which was again rejected.

I have gone thus at length into the history of the church, merely for the purpose of endeavoring to ascertain whether the question involved in this controversy is a well settled and well considered point of church government and discipline among them ; and I confess I see no room for a doubt. If there was any on my mind, it would readily be removed by a recurrence to some of the considerations which were presented on both sides of the question, when it was under discussion at their various assemblages. On one side, it was urged that the proposed changes were most in conformity to the genius of our people, to have a voice in the election of those who are to rule over

them; that it was dangerous thus to augment the power of the episcopacy; that a preacher or a congregation ever so much oppressed in the appointments would have no redress; that it was impossible for any bishop to have all that local knowledge which is essential to enable him to make the most judicious appointments; that to give one man a control over five hundred, many of them his equals in wisdom and goodness, was an anomaly and an absurdity, finding no warrant in the scripture, or the fitness of things; and that however easily the power might be executed in the early period of the church, when the congregations were few, and the number of preachers small, it was impossible to execute it either intelligibly or safely when the persons to be affected by it were numbered by hundreds of thousands, and were spread over the whole face of a continent. And the example of the British church was cited, where after the death of Wesley, the power of stationing the preachers had been given to a committee, with an appeal to the conference. On the other hand, it was answered that the church of Christ was founded in some respects upon very different principles from those on which civil governments rested; that strengthening the power of the episcopacy was less to be dreaded than the engendering an electioneering spirit, which would give rise to agitations and strife incompatible with harmony and brotherly love; that though a particular preacher or congregation might be aggrieved in stationing him, that was a lesser evil than that which would flow from a destruction of the independence of the stationing power; that though the preachers and congregations retained their civil rights as citizens, on entering the church they became, voluntarily, subject to the restraints (not incompatible with their rights as citizens,) which were essential to the preservation and efficient action of the church; that as to the limited information and want of local knowledge in the bishops, the evil was practically remedied by their receiving information from others, and acting on their own unbiassed judgment, uninfluenced by the local prejudices which would affect those who from their position were liable to be biassed by partial interests and local

The People v. Steele.

feelings; that the control of one over five hundred was counter-balanced by the advantage of a superior knowledge of, and regard for, the whole, possessed rather by him whose duty it was to oversee the whole than by those who were confined in their observation to a limited sphere; and, finally, that as the itinerancy of the ministry was one of the chiefest instruments in the success which had attended the progress of the church, so its preservation, which was of the highest importance, could be most certainly secured when enforced rather by those who were independent of its action, than by either preachers or societies who would be more likely to consult their own wishes and interests than the good of the whole church. In citing these arguments, I must not for a moment be understood as intending to intimate, even, an opinion as to their soundness on either side, or as expressing any judgment on the propriety of the conclusion to which the church authorities arrived on the subject. That would be quite aside from the legitimate performance of my duty. But I cite them for a very different purpose—that, namely, of solving the question whether the power which these trustees are resisting is a fixed and undoubted principle of government in the church. And I am irresistibly conducted to the conclusion, that the itinerancy of the priesthood, enforced by the power of the episcopacy, is now, and for more than a century has been, the well established practice of this church; is clearly defined in the "Doctrines and discipline;" and has been again and again understandingly and advisedly justified and defended by the highest ecclesiastical tribunal known in its constitution.

This being determined, the questions occur: what was the duty of these trustees under the circumstances of this case? and how is that duty to be enforced? The first of these questions has an intrinsic importance far beyond that which the decision of the case now in hand could give it. It has a direct bearing upon the innumerable charitable and religious societies among us, which, as was remarked on the argument, stand as monuments on the moral face of our country, of the benevolence and enterprise of our citizens, diffusing the blessings of

knowledge, virtue and piety abroad in the land. The mere association of any number of persons into a charitable or religious society, does not of itself involve the existence of any such office as that which these trustees fill. It is only when, in order to protect their legal property or enforce their legal rights, they seek the aid of the law by an act of incorporation, that such office becomes necessary. ·Then it is requisite for them to have some person to represent them in their resort to legal remedies, and in the exercise of their legal rights. Hence, our general law relating to religious corporations provides that they must have a certain number of persons "to take charge of the estate and property belonging thereto, and to transact all affairs relative to the temporalities thereof," (2 *R. L. of* 1813, *p.* 212, § 3 ;) and those persons, called in the statute trustees, are incorporated, not the society or association whose officers they are. It is not an easy task to draw a line which shall clearly define the boundaries of their authority. The statute circumscribes it within the limit of the words I have quoted from its third section. Its fourth section points out their powers within those limits, yet it is by no means unfrequent for trustees to mistake the extent of their domination. Many of the cases, of a character like the present, which come before our courts of justice, display this mistake, and show a usurpation of power which properly belongs only to the ecclesiastical authorities. Their great and paramount duty is to see that the temporalities committed to their charge are fairly and fully devoted to the purposes which the founders had in view ; the intention of those founders being their polar star. All authority conferred on them is of necessity subordinate to this great end, and all exercise of it beyond the legitimate attainment of this end must be usurpation. It is no excuse for any aberration from this line of duty, for such officers to say that they have been directed to it, or are sustained in it by the majority, of those to whom they owe their appointment. They are not chosen to represent that majority, but rather to execute the trust of carrying out the intention of those from whose benevolence flow the temporalities put in their charge. If such an

excuse will be ever available, where is it to stop ?    What shall set bounds to its encroachment ?    And how long will it be before the church, the parsonage, and the school-house, which owe their very existence to the desire of spreading evangelical piety, will be desecrated by the orgies of the heathen in his blindness, or the subtleties of the infidel in his madness ?    They, from whose benevolence has arisen some pious foundation, or some noble charity, may have passed from the stage of life, leaving behind them some such monument of their love for God and man, in the confident expectation that the trust they have confided to posterity will be faithfully executed.    Upon what principle can it be justified, that they who now live to enjoy the fruits of the charity of the dead, should be permitted, at their caprice, to control, and perhaps to divert from its original purpose, the endowment which owes none of its support to them ?    No such principle is known in law or morals.    And it was the duty of the trustees, whose conduct is now under consideration, diligently to inquire and faithfully to execute the intention of those to whose contributions the estate, property, and temporalities committed to their charge, owed their very creation.    That intention has been easily ascertained to have been the establishment of a Methodist Episcopal Church, in connexion with the general church of that denomination, and in subordination to its ecclesiastical tribunals, and its "Doctrines and discipline ;" and the act of the trustees, which this court is now called upon to redress, is one of insubordination to those tribunals, and in violation of one of the most clearly defined and well considered injunctions of that discipline.

The duty of courts of law in such a case is very plain.    It is to enforce the performance of such duty, unless that performance involves some violation of the law of the land.

It has been no where suggested, either in the return of the respondents, or on the argument, that the exercise by the episcopacy of the power of stationing the preachers, without the consent of the congregation, is in violation of law.    The argument was, that it was contrary to the spirit of our institutions and the genius of our people.    If this were so, the remedy is at

hand and is to be found, reposing in full vigor among the very people who are alone affected by it    But is it so in fact ?    It is true it is our habit, and so consonant to our institutions, for our people to have a voice in the selection of the persons who rule over them.    Are the priesthood of any denomination in this country to be justly regarded in any sense as rulers of their people ?    If there is any dominion it is self-imposed, voluntarily submitted to, and may, at the pleasure of the subject of it, be at any time shaken off.    It is the dominion of influence alone, that influence which in a well ordered community will always flow in or out of the priesthood from holy zeal, a virtuous life, and disinterested labors for the good of others.    But it is a perversion of language to speak of that as a ruling power to be guided or controlled by popular elections, or to treat him as a ruler whose sole authority is the apostolic one of bringing sinners to repentance.    There are, however, principles in our institutions which have some bearing on the matter in hand. One is fidelity to a trust reposed ; a duty, the performance of which in public or private, in the civil or religious walks of life, is no where more rigidly exacted than among our people. Another is that which was so happily expressed on the argument—that in this country religion is not established, it is not tolerated—it is PROTECTED.    To that protection it has an absolute right, whatever the tenets maintained, or the discipline established, so that they be not contrary to the law of the land or injurious to the public morals.    That protection is now sought at the hands of this court, and it only remains to inquire whether, according to its rules and practice, it has the power to award it.

The power of this court to award the writ of mandamus in a case of this character, was not directly questioned on the argument, but some considerations were suggested which, if allowed the weight claimed for them, would amount to a denial of the power.    Until the time of Lord Mansfield, that great vindicator of the law, who swept from its members the useless trammels with which antiquated forms had restrained the freedom of their action, this writ had been of comparatively little

The People v. Steele.

value. It had been called a writ of restitution, and had been confined exclusively to offices of a public nature. (*Ang. & Ames on Corp.* 566.) But in several cases which came before him, *Rex* v. *Blooer*, in 1759, (2 *Burr.* 1043 ;) and *Rex* v *Barker and others*, in 1762, (3 *Burr.* 1265 ;) he extended its operation, first to the case of a curate in the established church, next to that of a dissenting minister, and laid down the principle that "where there is a right to execute an office, perform a service, or exercise a franchise, (more especially if it be in a matter of public concern, or attended with profit,) and a person is kept out of possession, or dispossessed of such right, and has no other specific and legal remedy, the court ought to assist by a mandamus, upon reasons of justice as the writ expresses, *Nos A. B. debitam et festinam justiciam in hac parte fieri voluntes ut est justum ;* and upon reasons of public policy, to preserve peace, order and good government. And from that day that principle has been received as one firmly embodied in our law. The courts of our state have frequently acted upon it, declaring it to be proper where some legal right has been refused or violated, and there is no other appropriate legal remedy, and regarding the jurisdiction by means of it as one of immense importance and extent, belonging to this court alone, and extending to all inferior courts, tribunals and officers, executive, ministerial or judicial, and operating summarily, and in some instances definitely upon most important interests. (*The People* v. *Superior Court of New-York,* 5 *Wend.* 122. *The People* v. *Supervisors of Albany,* 12 *John. Rep.* 414. *Hall* v. *Supervisors of Oneida,* 19 *Id.* 260. *Ex parte Nelson,* 1 *Cowen,* 423. *Ex parte Bailey,* 2 *Id.* 479. *The People* v. *Niagara C. P.* 12 *Wend.* 246. *The People* v. *Supervisors of Columbia,* 10 *Id.* 285. *The People* v. *Throop,* 12 *Id.* 183. *Ex parte Jennings,* 6 *Cowen,* 518. *Minklear* v. *Rockfeller,* 6 *Id.* 276. *Ex parte Rogers,* 7 *Id.* 526. *Oneida C. P.* v. *The People,* 18 *Wend.* 79. *The People* v. *Dutchess C. P.* 20 *Id.* 658.)

This extension of the authority of this writ has been adopted in other states. (20 *Pick.* 484. 3 *Hen. & Munf.* 1. 4 *Har.*

The People *v.* Steele.

*&. McH.* 429.)   And been sanctioned by the supreme court of the United States.   (*Kendall* v. *U. S.* 12 *Pet.* 629.)   So far as regards inferior judicial tribunals, the operation of the writ in this state has, by the case in. 18 *Wend.* 79, been confined simply to. a mandate that they proceed; but as to corporations and ministerial officers, the authority of the writ is clearly recognized to be not only to set them a going, but to direct the mode and manner of their going. (*The People* v. *Dutchess C. P.* 20 *Wend.* 658.   *McCullough* v. *Mayor, &c. of Brooklyn,* 23 *Id.* 461.)

It was however objected on the argument, (1.) That the relator had an adequate remedy by ejectment, and therefore this writ ought not to go; and (2.) That the function of pastor of this church being already filled, it was not the province of this writ to remove the present incumbent from his possession. Both positions are unsound : the latter particularly so, because it would make the wrong done a complete barrier, of itself, to an adequate remedy for it.   As to the first objection, there are two conclusive answers : one is, that ejectment would not be an adequate remedy.   Even if it might give the relator possession of the parsonage, how could he bring that action to obtain possession of the pulpit, or how could it give him the right to visit his parishioners, or receive his salary?   And the other is, that it is well settled that as to corporations and ministerial officers, the existence of another and an adequate remedy is no objection to awarding this writ. (*The People* v. *Mayor, &c. of New-York,* 10 *Wend.* 393.   *Mc Cullough* v. *Mayor, &c. of Brooklyn,* 23 *Id.* 461.)   As to the second objection, the counsel, in making it, overlook the fact that the writ of mandamus was, in its origin, a writ of restitution, and that, in an early period, it was used to restore or admit a person to an office.   (11 *Co.* 93.   2 *Sid.* 112.   2 *Bulst.* 122.   *Vent.* 77.   *Raym.* 12.   2 *Stra.* 1023.   2 *Rol. Rep.* 82.   *Salk.* 175.   4 *Mod.* 281.)   But without multiplying authorities on this point, I will content myself with a more particular reference to two of the cases which I have cited, because they bear very directly upon many parts of this case.

The People *v.* Steele.

The case of *Runkel* v. *Winemiller*, (4 *Har. & McHen.* 430,) was one where the relator, as minister of a German Reformed Christian Church, after he had been duly inducted and put in possession of his function and the emoluments of it, for ten years, was removed. He applied for this writ, and it was objected that the person in possession had not been made a party to the proceedings. The objection was overruled, and the court lay down the broad proposition, that every endowed minister, (that is, those to whose function emoluments are attached,) of any sect or denomination of Christians, who has been wrongfully dispossessed of his pulpit, is entitled to the writ of mandamus to be restored to his function and the temporal rights with which it is endowed. In the case of *Rex* v. *Barker*, (3 *Burr.* 1265,) the trustees had put a minister into possession and maintained him therein against the relators. The objection was directly taken, that the writ of mandamus could not lie to admit where another was in possession, and a distinction was attempted between a writ to restore one who had been in possession, and to admit one who had a right but had never been in possession.

Lord Mansfield, overruling those objections, held that this writ was introduced to prevent disorder from a failure of justice and defect of police. Therefore, it ought to be used upon all occasions where the law has established no specific remedy, and where, in justice and good government, there ought to be one. If there be a right, and no other specific remedy, this should not be denied. And he adds: "Should the court deny this remedy, the congregation may be tempted to resist violence by force. A dispute, who shall preach Christian charity, may raise implacable feuds and animosities, in breach of the public peace, to the reproach of government and the scandal of religion. To deny this writ, would be putting Protestant dissenters, and their religious worship, out of the protection of the law. This case is entitled to that protection, and cannot have it in any other mode than by granting this writ." Guided by the principles, and following the example of this great luminary of the law, I rule in this case, as he did in that, for want of a sufficient return, a peremptory mandamus must issue.