STATE OF MISSOURI *ex rel.* SAMUEL S. WATSON, Defendant in Error, *v.* ROBERT P. FARRIS *et al.*, Plaintiffs in Error.

1.   *Quo warranto — Lindenwood College — General Assembly — "Declaration and Testimony" signers.* — The charter of Lindenwood Female College provided that vacancies in its board of trustees should be filled by the presbytery which was "connected with the General Assembly of the Presbyterian Church in the United States of America, usually styled 'Old School.'"   By resolution passed in May, 1866, the General Assembly resolved that if any presbytery should enroll one or more signers of a paper known as "The Declaration and Testimony," that presbytery should, *ipso facto*, be dissolved, and that its ministers and elders adhering to the General Assembly were authorized to take charge of the presbyterial records, to retain the same, and to exercise all the authority and functions of the original presbytery until the next meeting of the General Assembly.   In pursuance of this resolution, the Presbytery of St. Louis was, by one of its members, pronounced dissolved, in September, 1866, for enrolling a signer of that paper.   *Held,* that a presbytery so dissolved had no power to appoint trustees of Lindenwood College; and that on

proceedings in *quo warranto* against such trustees, they were properly ousted in favor of others, appointed by a body composed of members of that presbytery adhering to the General Assembly.

2. *Ecclesiastical law — Old School Presbyterian General Assembly, powers of.* — The General Assembly of the Presbyterian Church, commonly known as "Old School," possesses the unlimited control of superintending the concerns of the whole church, and of suppressing schismatical contentions and disputations. It combines within itself all the branches which constitute the elements of a complete government, namely, executive, legislative, and judicial; and acts upon all subjects coming before it according as they belong to each or either of these departments. It possesses extensive original and appellate jurisdiction, and whether a case is regularly or irregularly before it is a subject for it to determine for itself; and no civil court can revise, modify or impair its action in a matter of merely ecclesiastical concern.

### *Error to Sixth District Court.*

*Glover & Shepley*, and *Lackland, Martin & Lackland*, and *Lewis*, for plaintiffs in error.

I. No property right or power can be derived from a violation of the laws of the church by any party. (Inne, 271, 376, 378, 380, 385, 399; The Scottish Seceders, 1 Dows, 16; Muller v. Gable, 2 Denio, 492; The People v. Steele, 2 Barb. 397; Kniskern v. The Lutheran Church of St. John & St. Peter *et al.*, 1 Sandf. Ch. 439.)

II. The decisions of ecclesiastical bodies are final and conclusive on all subjects within their jurisdiction; but they may be controlled and examined by courts of law. (Smith v. Nelson, 18 Verm. 511; 11 N. Y. 243; 4 Whart. 531; Parish v. Tooke, 29 Barb. 256; Robertson v. Bullions, 9 Barb. 134; Watson *et al.* v. Avery *et al.*, 2 Bush. 332; Natal v. Gladstone, Law R., 3 Eq. Cas., 1; Inne, 266.)

III. The General Assembly in 1866 passed the decree dissolving and destroying the Presbytery of St. Louis in an event named. They had no lawful power derived from the constitution and laws of the church so to decree. The constitution and laws of the Old School Presbyterian Church had the force of a contract among the several persons entering into that ecclesiastical organization. By the terms of this contract, the directors of the college were to be appointed by the Presbytery of St. Louis.

But what is that? Certain persons constituted, according to the constitution and ordinances of the church, into an ecclesiastical body. Its membership is liable to change; old members are continually going out, and new ones continually coming in. But this must be done according to the laws of the church. This was the contract. It was the lawful Presbytery of St. Louis that was meant by the charter. A presbytery made up arbitrarily, contrary to church laws, in defiance of church laws, is not a presbytery at all in the meaning of the charter.

IV. There is nothing in the laws of the church which tends to show that the General Assembly possesses original as well as appellate jurisdiction in the matter of process against gospel ministers or church members. ( *Vide* Conf. Faith, 478 to 488.) If this be the law of the church, there might be two prosecutions going on at once. The General Assembly, after trying a case of its original jurisdiction, might be required to try the same case by appeal. No proper citation was issued to the signers of the declaration and testimony.

*H. Hitchcock*, with whom was *J. C. Orrick*, for relator.

I. The burden is on the defendants to prove a perfect title to the office, through an election duly held by the proper electoral body, in strict accordance with the charter provisions. Failing in any one material issue the judgment of ouster must follow. (Ang. & A. on Corp. §§ 115, 118, n. 2, 123, 126, 343; also §§ 756, 758, 759.

The charter clearly intended the successive elections of directors to be held by the presbytery of St. Louis, which was, and which should at the date of each election be, in connection with the "General Assembly." The proof was, that prior to April, 1867, and ever since, the body in question claimed, by defendants, to be the true "Presbytery of St. Louis," ceased, in fact, to have any ecclesiastical connection with the Old School General Assembly.

The corporation created by this Act was to have perpetual succession. One-third of its members, however, were to vacate their offices each year, and the succession was to be kept up

forever by annual elections, to be held by another body not incorporated, but a mere voluntary ecclesiastical organization adopted *pro hac vice* by the Legislature. This electoral body the charter identifies forever ; 1st, by its membership at the date of the Act ; 2d, by its ecclesiastical relations. From the nature of the case the latter must have been intended as a perpetual and and indispensable means of identifying the electoral body. (See Sedg. on Stat. and Const. Law, pp. 231, 233 ; Smith on Stat. and Const. Constr'n, §§ 486, 502, 574, 613, 712 ; People v. Utica Ins. Co. 15 Johns. 358, 380 ; Miller v. Gable, 2 Denio, 540 ; Rex v. Devonshire, 1 B. & C. 609.) The General Assembly, in May, 1867, expressly decided that this body, though claiming to be the "Presbytery of St. Louis, Old School," was not such, and had no connection as such with the Assembly.

II. The decision of the General Assembly as to the ecclesiastical *status* of the body in question, is conclusive of this cause: because—

1. Being a matter purely of spiritual cognizance, it is conclusive on the civil courts, which are bound to accept as final the decision of ecclesiastical courts as to questions of ecclesiastical right or relations. (See the following cases : Harmon v. Dreher, 1 Speer's Eq. 121 ; McGinnis v. Watson, 41 Penn. St. pp. 1, 14, 20, 30 ; Den v. Bolton, 7 Halstead's (N. J.) 205, 232 ; Commonwealth v. Green, 4 Wharton, 599 ; Robertson v. Bullions, 9 Barb. Sup. C. 78, 134 ; Shannon v. Frost, 3 B. Monroe, 258 ; Gibson v. Armstrong, 7 B. Monroe, 481 ; Harper v. Strauss, 14 B. Monroe, 56 ; also 42 Penn. St. 508 ; 3 Barr, 291 ; 4 Zab. 658 ; 2 Richardson's Eq. 215 ; 23 Ill. 456 ; 7 Dana, 195 ; 1 Edwards' Ch. 591, 592 ; 2 Denio, 492, 540 ; 20 Johns. 12 ; 3 Paige's Ch. 296, 301 ; 7 Verm. 291 ; Saxton's 577 ; 1 Sandford's Ch. 439 ; 2 Dessaussure, 431 ; 1 Hoffmann's Ch. 202 ; 7 Paige's Ch. 77 ; 3 Edwards' Ch. 79 ; 1 Rich. 99.)

2. Even if this court would review the action of the General Assembly in 1866 and 1867, complained of by defendants as unconstitutional and void, such action must be sustained as in accordance with the principles and usages of the Presbyterian Church.

The constitution of the Presbyterian Church—by which is meant the Confession of Faith, Form of Government, and Book of Discipline, promulgated by its highest authority—is not a contract between the members and officers of that church, nor is it to be expounded and enforced as such, in reference to matters spiritual, by the civil courts. It is the formal statement of those tenets concerning religious faith, practice, and discipline, which the members of said church believe to be set forth in the revealed will of God, and to which, as a matter of conscientious obligation alone, and not for any consideration known to the law, they engage, when they unite with the church, to conform.

An essential principle of this constitution is that in all matters spiritual the decision of the church, through its constituted authorities, is final; and the General Assembly is the highest tribunal, from which there is no appeal. (Form of Gov., ch. 2, p. 409; *id.*, ch. 8, I, II; Conf. of Faith, 115, 131; Baird's Dig. 614, 615.) This highest church court represents in itself *all the churches* of the denomination. (Form of Gov., ch. 12, §§ 1, 4, 5, pp. 429–30.) It is a "homogeneous body, uniting in itself, without separation of parts, the legislative, executive, and judicial functions of the government; and its acts are referable to one or the other of them, according to the capacity in which it sat when they were performed." (Per Gibson, C. J., 4 Whart. 601.) The original powers of the Assembly, as set forth in the constitution, include that of "deciding in all controversies respecting doctrine and discipline," and that of "suppressing schismatical contentions and disputations;" and it may proceed to exercise these powers either on appeal or *proprio motu*, on "common fame." It has repeatedly dissolved synods and presbyteries of its own motion, and may lawfully enjoin upon any presbytery the doing of any act within the province thereof. (See Baird's Dig. 276–8, §§ 103–4, 107–8; *id.* 301–2, §§ 170, 173; *id.* 669, §75; *id.* 728, § 127; *id.* 785, § 167.) And it has executed these powers by *ipso facto* ordinances. (*Id.* 774–9, § 157–9.)

The action of the Assembly in 1866 and 1867, which is here attacked as void, was in accordance with the constitution of the church, because—

State of Missouri ex rel. Watson v. Farris et al.

1. The Assembly had the right, in May, 1866, to take original cognizance and jurisdiction of proceedings highly rebellious and subversive of its own authority, and it lawfully ordered the inferior church courts to exclude from seats therein, pending charges of schism and rebellion against them, persons publicly engaged in proceedings arraigned by the Assembly as rebellious. (See Baird's Dig. 726–9, book VII, § 126, 127.)

2. It had the right to affix to the violation of such order the penalty of *ipso facto* dissolution of the presbytery violating it, and such dissolution followed, in fact and in law, upon the offense committed. (See precedent in 1838, Baird's Dig. 774–9, §§ 157–9; *id.* 785, § 167.) And in this matter the action of the Assembly in May, 1866, was a legislative act, while its decision of the claims of rival organizations, in May, 1867, was a judicial act, in each case final and conclusive as matter of church law. (Per Gibson, C. J., in Commonwealth v. Green, 4 Whart. 601; see also Baird's Dig. 253–4, § 46; 669, § 94; 692, § 106.)

III. The action of the General Assembly in May, 1867, was conclusive in respect to the *status* of the so-called presbytery of St. Louis, by virtue of whose action defendants claim here, and must be so treated by the civil courts, because—

1. The question of the ecclesiastical *status* of the so-called presbytery became *res adjudicata* by that decision. The Assembly was the highest church court, and was the final tribunal to which by the act of entering that church all its members agreed to refer all ecclesiastical questions.

2. Even if the constitution of the Presbyterian Church should be regarded as a mere contract, subject to be expounded and enforced in all its parts by the civil courts in reference to questions purely of ecclesiastical *status*, yet by the terms of the contract such a decision would be conclusive. (Story on Contracts, § 985 *h*; Boston Water Power Co. v. Gray, 6 Metc. 166; Bishop of Natal v. Gladstone, 3 Eq. C. (L. R.) p. 48; Inne's Law of Creeds, pp. 288, 311, 317, 319; also see Forbes v. Eden, Inne, 261–2, and the Cardross case, *id.* 294–7.)

But the true theory, and the one adopted without exception in American courts, is, that as Church and State are to be kept

wholly separate, so civil courts, while they will in all cases examine and enforce civil rights, will also accept as conclusive the decisions of ecclesiastical tribunals upon questions purely spiritual, and where civil rights depend on an ecclesiastical matter, "will take the ecclesiastical decisions, out of which the civil right arises, as it finds them." (Harmon v. Dreher, 1 Speers', S. C., Eq. 87, 121.) Applying this rule to the case at bar, the body in virtue of whose action in April, 1867, the defendants claim office was not the Presbytery of St. Louis designated by the charter, and the supposed election was therefore void.

WAGNER, Judge, delivered the opinion of the court.

The circuit attorney of the nineteenth judicial circuit exhibited to the Circuit Court, sitting in the county of St. Charles, an information in the nature of a *quo warranto*, at the relation of Samuel S. Watson, against the defendants in this proceeding. The controversy grows out of a conflict in which different persons claim the right to act as trustees of Lindenwood Female College, an institution of learning situated in St. Charles county. The college was incorporated by an act of the Legislature of this State, approved February 24, 1853, and the third section of the charter provides that the management of the affairs of the corporation shall be vested in a board of fifteen directors, and that at all meetings of the board five members shall constitute a quorum for the transaction of business. Section 4 provides that the board of directors named in the act of incorporation shall be divided into three classes of five each, one class of which shall vacate their offices in each succeeding year. The section then further declares: "The vacancies in the board, caused by the expiration of the terms of service of each of said classes, shall be filled by the Presbytery of St. Louis, of which several of the corporators are members, and which is connected with the General Assembly of the Presbyterian Church in the United States of America, usually styled the Old School." No difficulty ever arose, nor was there ever any dispute as to what body was entitled to fill the annual vacancies, till the fall of the year in 1866, when a disruption took place in the Presbyterian Church in St. Louis,

resulting in the organization of two separate and distinct Presbyteries, each claiming to be the legitimate church organization, and therefore invested with the power of supplying the vacancies as they occurred.

The difficulty and dissension grew out of the action of the General Assembly of the Old School Presbyterian Church in issuing its deliverances on the subject of loyalty and slavery during the progress of the civil war through which the country has just passed. These deliverances inculcated loyalty, took strong ground in favor of the general government in the struggle then going on, and pronounced emphatically against slavery. A minority of the church, residing principally in the two States of Kentucky and Missouri, dissented from the views contained in the deliverances and wrote and published a paper called the Declaration and Testimony, in which the proceedings of the General Assembly were assailed with great acrimony and bitterness. This paper was signed by a number of the ministers and ruling elders of the church. In commenting on the action of the General Assembly the paper says: "The whole mediatorial glory and dignity of the Messiah has been thus tarnished, and all the offices of prophet, priest, and king, which He executes for the salvation of His people, are subverted and surrendered. If this, then, be not apostacy, surely it needs but little to make it so, clearly, unmistakably, fatally. Nothing can prevent this but the blessing of Almighty God upon the efforts which His faithful witnesses may make to arouse the people to the reality and extent of the evil and danger, and to bring them, by prompt and decided action, to purge the church of the evil influence which has corrupted and betrayed her. Against this corruption and betrayal, therefore, we testify in the sight of God, and angels, and men. We wash our hands of all participation in its guilt. We declare our deliberate purpose, trusting in God, who can save by few as well as by many, to use our best endeavors to bring back the church of our fathers to her ancient purity and integrity, upon the foundation of the apostles and prophets, and under the banner of our only king, priest, and prophet, the Lord Jesus Christ. In this endeavor we pledge ourselves to assist and co-operate with each

other, and by the grace of God we will never abandon the effort, no matter what sacrifice it may require us to make, until we either have succeeded in reforming the church and restoring her tarnished glory; or, failing in this, necessity shall be laid upon us, in obedience to the apostolic command, to withdraw from those who have departed from the truth."

And the signers of the Declaration and Testimony sum up the line of action which they proposed to guide their future course as follows: .

" 1st. That we refuse to give our support to ministers, elders, agents, editors, teachers, or to those who are in any other capacity engaged in religious instruction or effort, who hold the preceding or similar heresies.

"5th. That we will extend our sympathy and aid as we may have opportunity to all who are in any way subjected to ecclesiastical censure, or civil disabilities, or penalties for their adherence to the principles we maintain, and the repudiation of the errors in doctrine and practice, against which we bear this our testimony.

" 6th. That we will not sustain or execute, or in any manner assist in the execution, of the orders passed at the last two Assemblies on the subject of slavery and loyalty, and with reference to the conducting of missions in the Southern States, and with regard to the ministers, members and churches in the seceded and border States.

" 7th. That we will withhold our contributions from the boards of the church—with the exception of the board of foreign mission—and from the theological seminaries, until these institutions are rescued from the hands of those who are perverting them to the teaching and promulgation of principles subversive of the the system they were founded and organized to uphold and disseminate. And we will appropriate the money thus withheld in aid of these instrumentalities which will be employed for maintaining and defending the principles affirmed in this declaration against the errors herein rejected, and in assisting the impoverished ministers and churches anywhere throughout the country who agree with us in these essential doctrines in restoring and building up their congregations and houses of worship.

" 8th. We recommend that all ministers, elders, church sessions, presbyteries and synods who approve of this Declaration and Testimony, give their public adherence thereto in such manner as they shall prefer, and communicate their names, and, when a church court, a copy of their adhering act.

" 10th. We do earnestly recommend that on the —— day of ——, A. D. 1865, a convention be held in the city of ——, composed of all such ministers and ruling elders as may concur in the views and sentiments of this Testimony, to deliberate and consult on the present state of our church, and to adopt such further measures as may seem best suited to restore her prostrated standards, and vindicate the pure and peaceful religion of Jesus, from the reproach which has been brought upon it through the faithlessness and corruption of its ministers and professors."

It will be thus perceived that the dissenters, in the Declaration and Testimony, arraigned the General Assembly as being guilty of betrayal, faithlessness, apostacy and corruption, and indicated their purpose to openly resist its authority, and in the event that they could not succeed in enforcing their sentiments, then they avowed their intention to withdraw from its control. Thus matters stood when the General Assembly, the highest court or judicatory known to the Presbyterian Church in the United States, met at St. Louis in May, 1866. Dr. Gurley, a member of that body, offered the following resolutions :

" *Resolved*, That this General Assembly does hereby condemn the Declaration and Testimony as a slander against the church, schismatical in its character and aims, and its adoption by any of our church courts as an act of rebellion against the authority of the General Assembly.

" *Resolved*, That the whole subject contemplated in the report, including the report itself, be referred to the next General Assembly.

" *Resolved*, That the signers of the Declaration and Testimony, and the members of the Presbytery of Louisville who voted to adopt that paper, be summoned, and they are hereby summoned to appear before the next General Assembly, to answer for what

they have done in this matter, and that until their case is decided they shall not be permitted to sit as members of any church court higher than the sessions.

"*Resolved*, That if any Presbytery shall disregard this action of the General Assembly, and at any meeting shall enroll as entitled to a seat or seats in the body, one or more of the persons designated in the preceding resolutions, and summoned to appear before the next General Assembly, then that Presbytery shall, *ipso facto*, be dissolved, and its ministers and elders who adhere to this action of the Assembly, are hereby authorized and directed in such cases to take charge of the presbyterial records, to retain the same and exercise all the authority and functions of the original presbytery until the next meeting of the General Assembly."

These resolutions were adopted by a vote of 196 ayes to 37 noes. (Assembly Minutes 1866, p. 60.) After this action of the General Assembly the Presbytery of St. Louis met in September of the same year. The facts necessary to be stated in connection with the disruption and reorganization of the presbytery are briefly these : After the formal meeting of the Presbytery for the transaction of business, and after the roll had been called and the absentees noted by the clerk, Mr. Niccolls, one of the members, protested against the admission of John J. Johns, to a seat in the body, on the ground that he was a signer of the Declaration and Testimony. Another member then offered a resolution, or motion which seems to be admitted to have been the *ipso facto* edict of dissolution on the part of the General Assembly, which was ruled out of order by the Moderator. An appeal from the decision was taken, and this was declared also to be out of order, and the Moderator refused to put the vote. Farris, in his testimony, says the Assembly brethren undertook strategy, and that the intention to execute the *ipso facto* order of the General Assembly was evident, and that, after the Moderator had refused to put the vote on the appeal from his decision, Dr. Wilson obtained the floor and pronounced the presbytery dissolved by authority of the General Assembly, and called Dr. Niccolls to the chair as the former Moderator. " After this," the witness says, " there was

a great deal of disgraceful confusion in the house of God." Dr. Niccolls testified that, after the announcement made by Dr. Wilson, to the effect that by the authority of the General Assembly the Presbytery was dissolved, a motion was made that he (witness) take the chair as Moderator. The vote was put and carried. He then organized the presbytery with prayer, after which a motion was made and carried electing McCook stated clerk, and then the Presbytery on motion adjourned, to meet the next day at Kirkwood. The Declaration and Testimony members remained and proceeded with what they claimed to be the regular business of the presbytery, and adjourned after electing Gilbreath moderator, and Booth temporary clerk. In the following spring, April, 1867, this last mentioned body elected the defendants trustees of the Lindenwood Female College.

In May, 1867, each of these rival judicatories claimed representation in the General Assembly of the church, sitting at Cincinnati. A committee to whom the question of admission to seats was referred, reported adversely to the claims of the Declaration and Testimony Presbytery, and admitted the Assembly brethren. The report was concurred in by a vote of two hundred and sixty-one ayes to four noes (Assembly Minutes, 1867, p. 334.), the General Assembly at the same time declaring that the presbyteries in Missouri adhering to the General Assembly, and disclaiming the Declaration and Testimony, were to be respected and obeyed as the true and only lawful judicatories within the State of Missouri, which were in connection with and under the care and authority of the Presbyterian Church in the United States of America.

In 1868 the Declaration and Testimony Presbytery did not send commissioners to the General Assembly, and were not represented in that body, nor is there any evidence to show that they have had any connection with the same since that time. Such is a concise outline of the facts as developed in this case. It is contended on behalf of the defendants that the action of the General Assembly, in passing the resolution of Dr. Gurley, *ipso facto* dissolving the church organizations that maintained the Declaration and Testimony, or that admitted to seats, or permitted to be

enrolled, the signers thereof, was *ultra vires* and void ; that the General Assembly exceeded its jurisdiction ; that its functions are appellate only ; that it can only deal with, or take cognizance of, cases that come up regularly from the lower courts by appeal, complaint, reference, or review of their records, etc. On the other hand, it is argued for the plaintiff that the General Assembly is the aggregate of all the individual church presbyteries and synods, and has jurisdiction over all the synods, and concurrent original jurisdiction with each synod, presbytery, and session, down to each individual church.

And they further seek to derive authority for the course pursued in this case from the Form of Government, chapter 12, section 5, which says : " To the General Assembly also belongs the power of deciding in all controversies respecting doctrine and discipline ; of reproving, warning, or bearing testimony against error in doctrine, or immorality in practice, in any church, presbytery, or synod ; of erecting new synods when it may be judged necessary ; of superintending the concerns of the whole church ; of corresponding with foreign churches, on such terms as may be agreed upon by the Assembly and the corresponding body ; of suppressing schismatical contentions and disputations, and, in general, of recommending and attempting reformation of manners and the promotion of charity, truth, and holiness through all the churches under their care." The argument that the *ipso facto* decree was a nullity proceeds on the theory that the offense with which the Declaration and Testimony members were charged could only be tried judicially, and that, before any sentence could be passed upon them, it was a necessary prerequisite that they should have been regularly cited, and full opportunity afforded them of making their defense. Were the General Assembly a court, proceeding according to the course of the common law, this position would be incontrovertible. It can not, however, be said that the persons arraigned were deprived of all opportunity to make their defense, for they were cited to appear and answer for what they had done — and the facts show that some actually did go — but still the citation was not such a service as would be required in a civil court. But whether the

General Assembly had original jurisdiction in the case, and acted within the prescribed limits of its power, depends essentially on its structure and the authority vested in it in its formation. It is the highest ecclesiastical tribunal in the Presbyterian Church, and all organizations and members of the church act in subordination to it. It possesses the unlimited control of superintending the concerns of the whole church, and of suppressing schismatical contentions and disputations. It combines within itself all the branches which constitute the elements of a complete government, namely: executive, legislative, and judicial. Superintending the concerns of the church and suppressing schism are certainly not judicial acts. In a case entirely analogous to the one we are now considering, where the General Assembly, of its own motion, in 1837, exscinded the synods of Utica, Genesee, Geneva, and the Western Reserve, it was held by a court of the very highest authority and respectability that the Assembly did not exceed its power, and that the exscinding orders amounted to ordinances of dissolution, and were the valid exercise of a constitutional power.

In delivering the opinion of the court, C. J. Gibson said: " Could the synods, however, be dissolved by a legislative act? I know not how they could have been legitimately dissolved by any other. The Assembly is a homogeneous body, uniting in itself, without separation of parts, the legislative, executive, and judicial functions of the government, and its acts are referable to the one or the other of them, according to the capacity in which it sat when they were performed." (Commonwealth v. Green, 4 Whart. 531.) By reference to Baird's Digest it will be seen that the General Assembly has always claimed and freely exercised the power contended for. In 1837, as above stated, it entirely cut off and disowned four synods, which led to the formation of what is known as the New School Presbyterian Church. In 1839 it dissolved the synods of Tennessee and Michigan, and the ministers and churches which adhered to its authority were attached to other synods. There seems to have been no dissent as to its power and jurisdiction thus to act in the premises, among its own members. Where jurisdiction has for a long

period of time been exercised by a court or body, the presumption is that it has been lawfully and rightly exercised. Every superior court must be the judge of its own powers and jurisdiction. It is true, the Supreme Court of the United States, the Supreme Court of the State, and the highest judiciary or court may err, and may do unconstitutional things, but what tribunal in such cases can exercise a revisory power and undo these things? Can an inferior court presume to decide that the superior court has transcended its power, and that its judgments are not obligatory? Suppose this court, in the exercise of its original jurisdiction, determines a matter which the Circuit Court or the County Court deems wrong, can one of these inferior tribunals disobey it, and, on that account, raise the standard of resistance and adjudge it to be invalid? If this were so, it would, in effect, be an appeal from the higher court to the lower court.

It is fit and proper that there should be an end to litigation, and an adjustment of difficulties, and to accomplish this end courts of last resort have been established. It does not follow that the judgments of the highest courts or judicatories are always right, for everything done by man is at best imperfect, and liable to be erroneous, but it is the best system which has yet been devised for the well-being of society and the protection of human rights. Now, the General Assembly is the highest court or judicatory known to the Presbyterian Church; it possesses extensive original and appellate jurisdiction, and whether the case in the matter of the Declaration and Testimony signers was regularly or irregularly before it, was a subject for it to determine for itself, and no civil court can revise, modify or impair its action in a matter of purely ecclesiastical concern. But in addition to this it has legislative and executive capacity, and acts upon all subjects coming before it, according as they belong to either or each of those departments. It seems that, in conformity with the theory and and doctrines of the church, it is the source and fountain of power, and that its authority is neither delegated by nor derived from any human body. The utter impolicy of the civil courts attempting to interfere in determining matters

which have been passed upon in church tribunals, arising out of ecclesiastical concerns, is apparent. It would involve them in difficulties and contentions, and impose upon them duties which are not in harmony with their proper functions. Before a court could give an enlightened judgment it would necessarily have to explore the whole range of the doctrine and discipline of the given church, and survey the vast field of the Divine Word. In matters of litigation where the title to property comes in contest, the rule would be different, as it is the imperative duty of the courts to adjudicate upon the civil rights of all parties. Happily in this country, there is a total disconnection between the church and state, and neither will interfere with the other when acting within their appropriate spheres.

In the case of Gibson v. Armstrong, 7 B. Monroe, 481, there was a controversy growing out of the disruption of the Methodist Episcopal Church in 1844; the plaintiff sought to get the church property, on the ground of the unconstitutional division of the church; the defendants relied upon the division for their protection to it. Upon this question the court said: "It is for the authorities of the church in the first instance to judge of an infraction of its laws, and to determine whether the ecclesiastical jurisdiction belonging to any particular body or functionary of the association had been forfeited by such infraction. * * * The party setting up a claim on the ground of such alleged invalidity should at least plant itself upon some opposing act or judgment of some recognized organ or body in the church having the authority to act or to judge in the premises." Again, the court says: "And the Southern Conferences having, in virtue of these resolutions, erected an extensive ecclesiastical organization, whose rights and jurisdiction are based upon their authority, we are by no means sure that a court of justice, a power outside of the church, has a right to disturb the state of things sanctioned by such evidences of its legality, and by the acts and opinions of the highest tribunals of the church, upon the ground of its own mere opinions that one of these tribunals has violated not the law of the land, but the law or constitution of the church. There would seem to be due from the tribunals of the civil gov-

ernment to those of the church at least so much respect as to require that the acts done by the latter in the name of the church should be deemed valid under its law, and that the dependent right should be determined accordingly, until those acts were reversed by the church, or at least until they were conclusively demonstrated to be against its law."

The same court in Shannon v. Frost, 3 B. Monroe, 261, where a majority of a church had expelled a minority, without charges and without trial, and which also involved their property rights in and to the use of the church edifice, uses the following language: "Whether right or wrong, the act of excommunication must, as to the fact of membership, be law to this court."

In Robertson v. Bullions, 9 Barb. 134, the judge, speaking for the court, says: "I do not see how we can look beyond the decision of the synod. All the authorities agree that the civil courts can not upon the merits, overhaul the decisions of ecclesiastical judicatories in matters properly within their province."

In the case of Harmon v. Dreher 1 Speer's Eq. 87, it was decided that in this country no ecclesiastical body has any power to enforce its decisions by temporal sanctions; that such decisions are advisory; that they are addressed to the conscience of those who have voluntarily subjected themselves to their civil sway, and except where civil rights are dependent upon them, they can have no influence beyond the tribunal from which they emanated; that a civil court will not look into the regularity of the process by which an ecclesiastical body proceeds to its judgment. Every competent tribunal must of necessity regulate its own formulas.

In The German Reformed Church v. Siebert, 3 Barr. 282, it is held that "the decisions of ecclesiastical courts, like every other judicial tribunal, are final; as they are the best judges of what constitutes an offense against the word of God and the discipline of the church. Any other than these courts must be incompetent judges of matters of faith, discipline, and doctrine; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncer-

tainty and doubt, which would do anything but improve either religion or good morals."

In Den, etc., v. Pilling *et al.*, 4 Zab. 453, it is held that a congregation or inferior ecclesiastical corporation, which by its organization is connected with and subject to the superior jurisdiction of the church to which it belongs, can not, by the act of the corporation or a majority, secede from the denomination, declare themselves independent, and take their corporate property with them. There are many other authorities which might be quoted, affirming and establishing the same doctrines. The power of the General Assembly to issue its deliverances is undoubted, and sanctioned by a long line of precedents. If those deliverances are deemed objectionable by any number of the constituent parts of the church, they may oppose them by lawful means until they obtain their reconsideration or repeal in the body that passed them. If the Congress of the United States or the Legislature of a particular State enacts a law that is distasteful to a minority, the remedy for the minority is not by resisting the law and raising the standard of revolt. Such a course would be destructive of all government, and lead to continual anarchy and revolution. It would destroy that obligatory force and permanency which is the only safeguard for all government, whether human or divine. A law or ordinance regularly passed must be obeyed until annulled or reversed by the superior body intrusted with power in that behalf. The rule is the same in all forms of government, whether instituted for secular or ecclesiastical purposes. The Declaration and Testimony members occupied a subordinate position to the General Assembly, the proceedings of that body were binding upon them, and their recourse was to appeal by all lawful means to the superior judicatory to modify its views, or reverse its action; and, in the event of failure, if they could not conscientiously acquiesce, then, according to the doctrines of the church, they had the privilege of peacefully withdrawing.

But they could not boldly defy the authority of the church, openly secede, and then claim all its rights and privileges. When they entered into the membership of the church they knew the

extraordinary power which was centered in the General Assembly, and obedience and acquiescence in that power was one of the conditions of membership.    They had the right to dissolve that connection, but it was not competent for them to subvert the authority of the majority.    But the General Assembly itself has adjudicated upon this subject; that judgment is conclusive upon us.    We will not undertake to penetrate the veil of this church power.

The question, then, is as to the right of the defendants to act as trustees for Lindenwood Female College by virtue of their election.    It is in evidence that they were elected by a body who had ceased to have any connection with the General Assembly of the Old School Presbyterian Church; that the presbytery whence their title emanated was dissolved in obedience to its orders.

The charter provides that the vacancies shall be filled by the presbytery "which is connected with the General Assembly of the Presbyterian Church in the United States of America, usually styled the 'Old School.'"    Such being the case, the body from which the defendants purport to derive their official titles had no power or authority to act in the premises, and the judgment of ouster, rendered in the court below, must be affirmed.    The other judges concur.