————0————

SAMUEL S. WATSON, *et al.*, Respondents, *vs.* ALEXANDER GARVIN *et al.*, Appellants.

PER CURIAM.

1. *Presbyterian church—General Assembly—Decree against signers of "Decla. ration and Testimony"—Effect of—Property rights—Exscinded congregation carries with it property conveyed in trust for its use.*—The decree rendered by the General Assembly of the Presbyterian church against the signers of the "Declaration and Testimony" which declared them to be incapable of sitting in any church judicatory higher than a session, did not excommunicate them as church members, or depose them from their ministerial office nor in any manner treat them as individual members of the church or congregation; and where property had been conveyed to be held for the use of a congregation, that is, for the members of the church composing the congregation, and such church had been cut off by such decree, the property was cut off with them. They could only cease to be members by voluntarily withdrawing or by excommunication, and this decree did not accomplish either their withdrawal or excommunication; and under such conveyance, there was no such implied condition of adherence to the general organism as should work a forfeiture or transfer of property to a new congregation when such adherence is dissolved, not by the direct action of the local body, but by that of the superior judicatory, and without any of the forms of judicial inquiry or trial.

Per ADAMS, Judge; NAPTON, SHERWOOD and VORIES, J. J., concurring; WAGNER, J., dissenting.

1. *Presbyterian church (Old School)—General Assembly—Deliverance on subject of slavery and loyalty—Competency of—Declaration and Testimony, signers of—Decree against, invalid—Property rights, not affected by.*—Under § 4 of the constitution of the Presbyterian church (Old School) which provides, that "Synods and councils are to handle or conclude nothing but that which is ecclesiastical; and are not to intermeddle with civil affairs which concern the commonwealth, unless by way of humble petition in cases extraordinary; or by way of advice for satisfaction of conscience, if they be thereunto required by the civil magistrate," the General Assembly of that church was

prohibited from making deliverances on the subject of slavery and loyalty and the obligations of the church in that regard, and such deliverances were therefore nullities as far as property rights are concerned ; and the decree rendered by the General Assembly, declaring that the signers of a paper called the "Declaration and Testimony," inveighing against such "deliverances," "should not be allowed to sit in any church judicatory, higher than a session, and that if they or any of them should be enrolled as entitled to a seat in any Presbytery, such Presbytery, should, *ipso facto* be dissolved, and the members adhering to the General Assembly were thereby authorized and directed to take charge of the Presbyterial records—to retain the name, and exercise all the authority and functions of the original Presbytery until the next meeting of the General Assembly," was also, as far as property rights were affected, a nullity.

2. *Ecclesiastical and civil courts—Relative jurisdiction—Property rights.*— Civil courts do not interfere with 'the decrees of ecclesiastical courts when no property rights are involved, because the civil courts have no jurisdiction in such matters and cannot take cognizance of them at all, whether they have been adjudicated by those tribunals or not. But when property rights are concerned the ecclesiastical courts have no power whatever to pass on them so as to bind the civil courts. If a member of the church feels himself aggrieved in his rights of property by the action of an ecclesiastical tribunal, he may resort to the civil courts, and they will not consider themselves precluded by the judgment of this tribunal.

## *Appeal from Sixth District Court.*

The following is the original opinion of the court rendered upon the first hearing of the case by Judge Bliss.

No briefs of counsel as presented on the first hearing, except such as were also presented on the re-hearing, have been furnished to the reporter.

BLISS, Judge, delivered the opinion of the court.

This controversy is between the members of two local church organizations, each styling itself the first Presbyterian church of St. Charles, and grows out of the action of the general assembly (O. S.) of the Presbyterian church, dissolving the Presbytery of St. Louis, and which was under review in The State *ex rel.* Watson vs. Farris, 45 Mo., 183. The action is for the recovery of the church building, parsonage and grounds.

The church was organized in 1818. The lot upon which the buildings are situate was obtained of the town of St.

Charles in 1833, and in 1857 the title was confirmed by the school directors of the city, in whom it had become vested. The ordinance under which the first deed was executed directed that the property be conveyed in fee simple to the elders and deacons of the Presbyterian church of St. Charles and their successors, with the special condition that it shall never be used for any other than religious purposes appertaining to the Presbyterian church of the town, &c.; and by the second deed the school directors, acting under an act of the legislature, released to Watson and others, their heirs and assigns, the same lot, in trust for the congregation of the First Presbyterian church of St. Charles, to be used and occupied for religious worship, &c., with a condition of reversion if used for secular purposes. The legal title to the property comes through the last deed, and as its conditions do not contravene the equities which might be claimed to have accrued from the occupation and improvement of the property under authority of the town, we need only look to that deed for the conditions upon which the property is held. And I may here premise that there is nothing in the terms of the deed creating the trust that shows that the congregation is or requires that it shall remain connected with or subject to any particular ecclesiastical jurisdiction, and if such requirement is found, it must arise from the fact that from its first organization it has been under the care of a presbytery which was subject to the jurisdiction of, first, the General Assembly of the Presbyterian church before its division in 1837, and afterwards of the Old School Assembly.

It is unnecessary to refer in detail to the unhappy controversy that has resulted in the rival organizations that claim the property involved in this suit. The leading facts are stated in the State *ex rel.* Watson vs. Farris, *supra*, and it is now sufficient to say that the defendants compose the majority of the congregation, and adhere to the presbytery of St. Louis, sought to be dissolved by the *ipso facto* ordinance of the General Assembly, and the plaintiffs, composing the minority, and desiring to retain their connection with the Gen-

eral Assembly through that presbytery of St. Louis which is still in fellowship with it, seceded, organized anew, and is recognized by the presbytery last named as the First Presbyterian church of St. Charles. Hence we have two local organizations of the same name, one, constituted by defendants, in possession of the property, and claiming a right to its continued possession from the fact that it is the original organization for whose use the property was conveyed, and has violated no condition of the grant, or in any manner forfeited its right to the continued use, and the other constituted by the plaintiffs, seeking the possession upon the ground that there is an implied condition that the church shall continue in the ecclesiastical connection held when the grant was made; that on the part of the defendants such connection has been dissolved, and that the plaintiffs compose the only organization entitled to the use of the property, according to such condition.

The plaintiffs seem to suppose that the question controlling the rights of the parties to this suit was decided by us in the State *ex rel.* Watson vs. Farris, but they mistake the scope of that decision. The action of the General Assembly there considered was purely ecclesiastical, and the power in controversy depended upon ecclesiastical action merely. As the highest legislative and judicial power in a centralized church, it had but exercised its ancient prerogative in making and unmaking presbyteries. They were its constituent bodies. The expediency or even the right to exercise such a power over them was an ecclesiastical question which the Assembly was competent to decide. Vacancies in the board of trustees of Lindenwood college were, by the terms of its charter, to be filled by a presbytery in connection with the General Assembly. To fill such vacancies by any other presbytery would be a violation of the charter. This provision was a designation -of the body that should possess the power of appointing trustees, and indicated the relations of the body to which the founders of the charity would entrust its administration. The confidence and trust was rather in

the General Assembly than in the local presbytery, and we were bound to assume that they acted in view of such a customary exercise of its power. Especially is this so when we see that the supervision of the Old School Assembly, instead of the New was provided for, the significance of which will appear when we consider that the schism creating the Old and New School bodies, arose out of an assumption by one party, and a denial by the other of the power of cutting off and dissolving synods and presbyteries by simple edict, without citation and trial. It is unnecessary to say what would have been our view in regard to the action of the General Assembly complained of, had its effect been to deprive the members of the St. Louis presbytery of property held for their personal use, as of a fund provided for their support. It might, perhaps, have been necessary to look behind the *ipso facto* ordinance to see whether it was regular and the deprivation lawful.

Nor do I understand, as seems also to be assumed, that the action of the General Assembly referred to, either deposed or excommunicated the clergymen composing the St. Louis Presbytery, or that it attempted to dissolve or in any manner affect the local churches in connection with it. An attempt was made to dissolve the presbytery, and its connection with the assembly was actually sundered, but the ministers remained ministers, and the churches remained intact. The clerical character of the former, and the organization of the latter are as complete as before the action of the assembly. Hence, when the defendants are spoken of as being out of the church, as having left the church, etc., nothing more is meant than that the presbytery, under whose care they have always been, is no longer in connection with the General Assembly. I have not learned that the Assembly ever attempts to depose a minister, except upon trial or appeal, or to deal directly with judicatories lower than presbyteries. They, and not the churches or ministers, are its constituents.

In the case before referred to (State, &c. vs. Farris), we considered the extent to which we will go in passing upon

the regularity of the action of ecclesiastical bodies, and held that in ecclesiastical matters we will treat such action as conclusive as to the ecclesiastical relations of subordinate bodies. The old presbytery of St. Louis, after the resolution of the General Assembly referred to, became an independent ecclesiastical body, and though continuing a presbytery in fact, is outside the national organization under the jurisdiction of such Assembly. While the adherence of defendants to this presbytery cannot be treated as a voluntary withdrawal from their connection with the General Assembly, for they did not withdraw in fact, yet they had the power to repudiate the action of their presbytery and place themselves under the care of one recognized by the Assembly. As good Presbyterians, they perhaps, should have done so; but not choosing to make the change, we are compelled to inquire into the effect of their action upon their property rights.

It is not pretended that the property in dispute is held under any express condition of subordination by the *cestui que trust* to any church judiciary. So far as the conveyance is concerned, no one would know to which of the numerous branches of the Presbyterian church this congregation belonged, or whether the name was not used with reference to its internal organization, rather than its subordination. So then, if we find the condition at all, it must arise from the fact that, from the beginning, it was in constant subordination to some presbytery which was a constituent of the General Assembly.

The authorities bearing upon the right of local congregations to control the property held by them or for their use, are so numerous and sometimes apparently conflicting, that in order to know what principles may be considered as settled, I deem it necessary to consider a few of them more at length than is ordinarily admissible.

The case of The Commonwealth vs. Green, 4 Wharton, 531, can only be treated as authority in regard to the power of the General Assembly of the Presbyterian church over its synods and presbyteries. The power, the exercise of which

gave rise to that controversy, was disputed by a large portion of the most distinguished members of that church; a new Assembly was organized, including the exscinded Presbyterians, claiming legitimate succession, but the old Assembly constantly adhered to the claim of power sustained by that case. This court as we have seen has recognized the doctrine of that case, and the recent return of the New School body to the old organization must be regarded as yielding all opposition within the church to this disputed power.

Soon after Commonwealth vs. Green, the case of Presbyterian Congregation vs. Johnston, 1 Watts and Serg., 9–57 came before the same court, in which the rights of local congregations were more particularly considered. In 1785, the proprietaries of Pennsylvania conveyed to trustees for the use of the religious society of English Presbyterians in York, a lot as a site for a house of worship and cemetery. Before receiving the deed the church had been organized and was under the care, first of the Donegal Presbytery, and afterwards of the Presbytery of Carlisle, which latter body became one of the constituents in the subsequent organization of the general assembly. The church continued under the Carlisle presbytery until the great schism in 1837, when, upon the adherence of said presbytery to the Old School, the congregation severed its connection with it. A minority withdrew, organized regularly, submitted to the presbytery, and sought to eject the majority from the church property, but the court held that there was no implied condition in the original grant under which the majority would forfeit their interest in the trust by the course pursued. In giving the opinion, Judge Gibson distinguishes it from the case where a majority of a church might seek to carry it over to a distinct denomination, intimating that in such case there might be a breach of an implied condition in the compact of association, but as the New School body was as really Presbyterian as the old, there was only a change of connection as regards different branches of the same denomination.

In Sutton vs. Trustees, &c., 42 Pa. St., 503, a congregation

of the Dutch Reformed church called a minister of another de-
nomination, who was examined by the classes and rejected.
The congregation then by a majority vote resolved to separate
the church from the general body, which the court held they
could not do.

The courts of New Jersey have often had the general sub-
ject before them, and have held that local church organiza-
tions not congregational in principle, are subject to the law
of the general organization. The case of Den vs. Bolton, 7
Halst., 206, so often cited, was an action of ejectment. The
title to property held for the use of a Dutch Reformed church of
Bergen county, was vested in the ministers, elders and deacons
for the time being, as trustees. A party had seceded from the
general body, and the ministers, elders and deacons of this
particular church renounced their dependence upon their old
classes and synod, and united with the seceding party. The
classes from which they had separated cited them to appear
and answer charges. They refusing to do so, the case was
heard, they were all deposed, and a new election ordered, which
was held by that portion of the church adhering to the whole
organization. The court held that the proceedings against the
old officers, and the election of the new ones were regular, that
the latter became the legal trustees and were entitled to pos-
session. Den vs. Pilling, 4 Zabr., 653, was also an action of
ejectment. The American Primitive society (Methodist) of
Patterson was subject to the general conference, but the ma-
jority seceded from it and refused to obey its orders. The
conference ordered a new election of trustees, who were chosen
by the adhering minority and brought suit for possession. The
cause went against them, upon the ground of irregularity in
the removal of the old trustees and election of the new ones,
but the court held that the society was subject to the general
conference, notwithstanding the subjection was not stipulated
in writing, that their connection with the ecclesiastical body
having rule over them could be inferred from facts connected
with their organization and continued relations. In these two
cases, the only question before the court, and really decided

was one of title. The property was held by certain officers of the local body, and by the usages of the denomination, such officers could be removed by the superior judicatory, and a new election provided for. The regularity of such removal and election controlled the question of title.

Hendricks vs. Leecow, 1 Saxton (N. J. Chy.), 577, involved the right of the orthodox and Hicksite Friends to the control of a certain school. The school was established by the Chesterfield Preparation meeting, and the trustees were to be chosen by such meeting. In the Society of Friends there is a strict subordination by the preparative to the monthly, by the monthly to the quarterly, and by the quarterly to the yearly meeting. The Hicksite members of the yearly meeting of Philadelphia, dissatisfied with the proceedings of the meeting of 1827, called a new one for 1828, to be held one week before the regular time. It resulted in a division of all the quarterly, monthly and many of the preparative meetings, especially the one at Chesterfield, each party claiming to be genuine. The court sustained the orthodox yearly meeting and the meetings in subordination to it, as in the regular succession both in organization and in doctrine, and have held that the orthodox preparation meeting of Chesterfield, although a minority, had the sole right to choose the trustees,

The chancellor (Walworth) in Gable vs. Miller, 10 Paige, 649, decreed possession of church property in favor of trustees elected by a minority of a German church in New York city, who adhered to the Dutch Reformed classes and synod, against the trustees of the majority, who had employed ministers in fellowship with the German Lutheran church. He reviews at length the history of this organization, shows the distinctions in the theology of the Lutheran and Calvinistic churches of Germany and Holland, and finds that the property was held in trust for worship by a church and ministry in connection with the Dutch Reformed church, and for doctrines recognized by its standards. Upon appeal, the court of errors, (2 Denio, 568) reversed the decree, principally upon the construction of the trust, and held the church to be independent,

and held that the majority might decide within the limits of evangelicism, upon its ecclesiastical connection, or whether it had any. The declaration of trust ran to I. M. Kern, pastor of the Calvinistic church of New York, and recited in substance, that certain German and Swiss inhabitants of New York have by contributions purchased a lot, and with the assistance of charitable and well disposed persons, are erecting a church thereon for the worship of God, concluding that "whereas all parties are inclined to preserve said estate for the pious uses aforesaid, now therefore, &c." Upon this language, Gardener, president of the court, says: "Upon the subject of the church government or connection, the declaration of the trust is entirely silent. We are not called upon to give a construction to an equivocal or ambiguous phrase, but to add by a resort to extrinsic testimony a new condition to the trust, unless indeed we are prepared to determine judicially that men cannot worship God in a house erected for that purpose without the supervision of a bishop or a synod," (p. 544). It may be difficult to find the exact principle that guided the action of a majority of the court, inasmuch as some of its members held that no condition of dependence could be implied from the actual relations of the church; that to be obligatory, it must be expressed in the deed. And others based the reversal upon the ground that this particular church had not uniformly been connected with the Dutch Reformed judicatories, but had at times maintained an independent position.

The case of Robertson vs. Bullions, 9 Barb., 64, was heard before the Supreme Court, and the trustees of the religious corporation were prohibited from employing a minister who had been deposed by the superior church judicatory. The trustees acquiesced, but the decree not going far enough to suit the petitioners, they took the case to the court of appeals, and it is reported in 11 New York, 243. The court affirmed the judgment so far as appealed from, and in two very clear opinions show that the judgment against the trustees would have been reversed had they also appealed. The judges based their opinion upon the fact that no conditions were ex-

pressed in the grant, and that the trustees were a corporation which by statute had complete control over the temporalities, though admitting that a voluntary religious association might subject itself to any lawful conditions and obligations. In New York, religious corporations have no denominational character, and their support may be transferred from churches of one denomination to those of another. The property held is limited by an express trust. (Petty vs.Troker, 21 N. Y., 267; Burrill vs. Associate Reformed Church, 44 Barb., 282; which conflict with the doctrine of People.vs. Steele, 2 Barb., 397.)

The case of Smith vs. Nelson, 18 Vt., 517, was a chancery proceeding to compel executors to pay over a trust fund. It appeared that the general synod of the Associate Presbyterian church had dissolved the presbytery of Vermont, and remanded its members to another presbytery, which deposed certain ministers. The dissolved presbytery, with other ministers sympathizing with it, formed a new synod, and recognized the deposed ministers. The Associate congregation of Ryegate had been under the care of the Vermont presbytery, and the majority retained a minister that had been thus deposed, while the minority, seceding, sustained the action of the synod, and claimed to be the true Associate Congregation of Ryegate. Before these difficulties, one Nelson had bequeathed a sum of money, " as a donation to the associate congregation of Ryegate, to be placed under the direction of the trustees of said society, and the interest thereof to be paid to their minister forever." The executor had paid the legacy to trustees of the minority, who refused to pay the interest to the deposed minister, retained by the majority; but Chief Justice Williams, in an elaborate opinion, held that he was entitled to it, and that the only inquiry to be made was whether the society had a minister chosen by the majority, and regularly ordained over them. He reviewed the ecclesiastical proceedings that had caused the schism, pronounced them irregular, and held that the local society was not bound by them.

In Ferrarea vs. Vasoncelleo, 23 Ill., 456, and 27 Ill., 237, a

church had been organized in connection with the presbytery of Glasgow, Scotland, which connection was dissolved and the church having been for a time connected with the Illinois presbytery, was received into the fellowship of the Sangamon presbytery (O. S). Afterwards the church withdrew from this presbytery, and the adhering minority brought suit against the trustees of the majority, claiming that, by virtue of such withdrawal, and their own adherence, they constituted the church, and asked for possession of the property. The court held that, unless there was some usage or provision in the constitution of the Presbyterian church authorizing a local organization to secede, it had no right to do so, and that by the secession of this church, its right to the use of the church property was lost, and that such use vested in the adhering members. It did not appear that any particular ecclesiastical connection was required, either in the deeds of the property, or otherwise; and it does not appear that the church had been practically independent in its choice of such connections. The case goes farther in subjecting the local organization to ecclesiastical control than any other I have seen, and certainly farther than the Kentucky cases cited in its support.

There are many other interesting cases where the rights of local congregations are involved, among which are Trustees &c. vs. Seaford, 1 Dev. Eq., 453; McGinnis vs. Watson, 41 Penn. St., 9, and Gibson vs. Armstrong, 7 B. Monroe, 481. But they differ so much in their controlling facts from the one at bar, that they throw but little light upon it. Those herein specially referred to, are where the property was held like that belonging to the St. Charles congregation, and I have made no allusion whatever to cases where the organization was based upon congregational principles.

In all the cases we find it, first, everywhere taken for granted, and must necessarily be so under our system, that upon matters purely ecclesiastical not affecting property rights, the decisions of the proper church judicatories are conclusive upon civil tribunals. They will neither inquire into their fairness, nor question their accuracy.

It is, secondly, also generally conceded, and it may be considered as settled, that in those religous denominations where the local organization is a constituent part of a general body, and dependent upon and under the control of a higher judicatory of that body, and, such relation is specified in and made a condition of a grant of property, the condition is binding, and a local church that by a majority vote would abandon such judicatory cannot take the property with them, but it must be held for the use of those who conform to the conditions of the grant. Such express trusts will be enforced whether there is a corporation holding the temporalities, or whether the property is held by trustees.

But, thirdly, in regard to the right of the local church to hold the church property under a change in ecclesiastical relations, where no condition of subjection to or connection with any particular general organism is expressed in the grant or others wise, but where such church is in fact and by its constitution a constituent part of a general body, and is dependent upon and under the control of the higher judicatory of that body, the decisions as we have seen, are not uniform. In many of the opinions it is held that in such cases it ought to be presumed that the funds were invested upon the implied condition of its continued adherence to such relation, and that a like conse· quence should follow a voluntary secession as if the condition were express. Other opinions, however, hold that the local organization, whether a corporation or otherwise, may use the property for the general purposes for which it is held, without being fastened to any particular denomination or branch of a denomination.

The case at bar comes under the last class of cases. The congregation of the First Presbyterian church of St. Charles is entitled to the use of this property, as we have seen, upon no express condition in relation to its ecclesiastical connection, although in fact it has never had but one such connection. But it does not become necessary for us to decide which of the views above indicated is correct, whether there is an implied condition of adherence to such connection or not, from the

fact that congregation has not voluntarily seceded. The whole argument of counsel is based upon the assumption of that fact and their conclusions fail, if that fact be not established. If this local body had not been connected with the exscinded presbytery, but after the excision, had, by a majority vote, withdrawn from a presbytery still holding the old connection, and united with the one exscinded, the question would have been raised, and we should be compelled to consider whether there had been a violation of an implied condition. But as it is, there was no withdrawal. The church was in effect itself cut off. It cannot be disputed that the presbyteries, are the constituents of the assembly, while the local congregations or their representative officers are the constitutents of the presbyteries; that they have no direct connection with the assembly and cannot be directly reached by it, and that cutting off a presbytery also cuts off its congregation. Here we are relieved from inquiring into the effect of a voluntary abandonment, by a local body, of its ecclesiastical relations.

We have seen that in the Presbyterian church the general assembly may cut off or dissolve presbyteries. But I have never known a case in any civil court, where it has been held that a resolution of a high ecclesiastical judicatory cutting off a lower one, whether by direct expulsion or conditional dissolution like the *ipso facto* ordinance, operates as a confiscation of the property of the local congregation held for their own use with no special trust, in case they do not withdraw from such exscinded body, or that it operates as a transfer of such property to new organizations created under authority of the exscinding power. It may be for the peace and good order of the church that such a power be lodged in the general representative body, —of that we can know nothing—but to suppose that it carries with it the power to thus change the titles to all the property of the local congregations would give it a scope and effect hitherto undreamed of. Without citation or hearing, without even the form of judicial investigation, the general assembly, assuming upon common fame the existence of certain local irregularities, as in 1837, or, desiring to punish the authors and

adherents of a libellous and schismatical document, as in 1866 prompted perhaps by intelligent zeal or perhaps by heated blood, expels by name large subordinate judicatories, or condemns in advance the action of certain clergymen and presbyteries; summons them by resolution to appear in the first in stance before the appellate body; suspends them in the mean time and dissolves any presbytery that shall admit them to a seat. This would seem to be thorough medicine, though perhaps necessary to meet the disease. It has always been a disputed point between the adherents of different ecclesiastical systems as to how much authority, or whether any at all, should be given to a central power. Upon ecclesiastical matters each must decide for itself. But no man or association of men can be deprived of property except by the law of the land. It is true that trusts pertaining to property held for ecclesiastical uses will be protected like other trusts and their proper administration enforced; but every presumption is in favor of the right of the local congregation to the continued use of property purchased and improved with its funds and held for its benefit, and that right will only be forfeited as a penalty for violating the conditions of the trust. That violation must be positive, affirmative action and cannot be predicated upon a position into which the congregation is thrown against its will, and by a summary exercise of power without judicial investigation. Whatever our opinion of the alleged libellous and schismatic cal character of the document which was the source of the troubles we find no action based upon it that can affect property. No person or presbytery, if such a thing may be, has been found guilty. No minister has been deposed according to the laws of the denomination, and when the St. Louis presbytery was dissolved, its members were not annexed to any other. The effect of the dissolution was to cut them off from ecclesiastical connection with the assembly, but still to leave them regularly ordained, undeposed Presbyterian ministers competent to perform and actually engaged in the performance of every pastoral duty. It is not for us to explain the precise ecclesiastical position of such undeposed ministers, but

only to say that local congregations by continuing them in the relation they had long sustained, which they were qualified to fill by their ordination and installation, and from which they had never been severed according to the laws of the church, either by deposition or by removal, cannot be found guilty of such a violation of the implied conditions upon which they hold their property as to work its forfeiture, or authorize its transfer to other organizations.

There have been many schisms in Presbyterian and other churches similarly organized, that have arisen from the exercise of extraordinary powers by the central body, but local church properties have, so far as I know, remained undisturbed. The exscinding ordinance of 1837, or as Judge Gibson called it in Commonwealth vs. Green, the ordinance of dissolution, cut off four among the heaviest synods of the church, each containing many presbyteries, and provided for the organization within their bounds of new churches and presbyteries in sympathy with the majority in the assembly. Among the multitude of churches thus cut off, holding the most valuable church properties in central and western New York and northern Ohio, I have not learned that a single attempt was made to transfer such property to the adherents of the general assembly. Some attempts were made outside the limits of the exscinded synods against those churches that, from sympathy with these synods, left the presbyteries that adhered to the assembly, but as in Commonwealth, &c. vs. Johnston, *supra,* they uniformly failed.

It may be claimed that under this view the property of the local church may be wholly diverted from the purpose of its original grant; that when the presbytery itself becomes diseased, there is no other remedy but to cut it off. I may not say what other remedies are provided, but I can imagine that in a church that has played such an important part in the history of constitutional liberty in Europe some mode less summary is known, and usually followed, and that factious and disorganizing men could be reached by methods analogous to trials and judgment in civil tribunals, and to amotions or disfranchisement in corporations.

Under this view of the rights of local congregations or churches to property held for their own use, without condition expressed, we cannot find any such implied condition of adherence to the general organism as shall work its forfeiture or transfer to a new congregation when such adherence is dissolved, not by the direct action of the local body, but by that of the superior judicatory, and without any of the forms of judicial inquiry or trial.

The judgments below are therefore reversed. The other judges concur.

A re-hearing of the case was granted, and upon the re-hearing the following briefs of counsel were presented and the following opinion rendered by the court:

*Glover & Shepley, and Lackland, Martin & Lackland,* for Appellants.

I. The case turns upon the construction of the deeds by which the property in dispute was conveyed in trust for the "First Presbyterian Church, of the town of St. Charles." The deeds vest the property in the congregation of the First Presbyterian Church. The church being composed of mem bers, equity fixes the use of the property in them, and unless the members sued in this case have lost their equitable right by force of some condition in the deeds, or unless they have ceased to be members of the said church and therefore no longer beneficiaries under the deed, the decree which was made by the court below is wrong.

II. There is no condition in the deeds which affects the question.

III. There is nothing to show that the plaintiffs in error, have ceased to be members of the First Presbyterian Church. It appears that in 1866 the General Assembly of the Presbyterian Church of the United States condemned as slanderous and schismatical, a paper issued by certain of her ministers and elders known as the "Declaration and Testimony," and that by a decree of the said General Assembly certain presbyterian synods, presbyteries, ministers and elders were arbitrarily expelled or cut off from the General

Assembly. But in the utmost scope of this decree it fell short of reaching any person as a church member. It neither purported to unpresbyterianize any one, or to make any person then a member no member of any church. It pronounced no judgment on "any member of the First Presbyterian Church of St. Charles. It put no member out of the church, it made no one of them a Methodist, a Baptist or a Catholic.

IV. The proceedings of the twenty-two members of the St. Charles Church were void so far as related to the title of the church property. They could determine their religious or social relations towards the forty-nine and no court could force different relations upon them ; but it was not competent for them by their own act to settle the rights of property between them and their brethern. When a question of property arises between church parties, the arbitrary opinion of one of the parties is not the rule of right. If a church has its articles of faith and discipline, the members enter the church in reference to these articles, and their property rights as members are based upon the articles and cannot be taken away by any proceeding in violation of such articles. Now what is the rule of decision in such a case ? Is an arbitrary act of a church in such case binding on property rights ? Are twenty-two members out of seventy-one the church ? If the forty-nine had expelled the twenty-two in the same way, would that be binding ? This class of legislation originated in England, and in the earlier cases the courts refused to interfere. But they found it was impossible to stand upon that ground. The doctrine was then laid down that in questions touching property rights of church parties, that party should hold the property that had acted in conformity to church laws. (Craigdallie vs. Aikman, 1 Dow. R., 1 ; McGinnis vs. Watson, 41 Pa. St., 1.)

V. The title to church property in case of a divided congregation is with that party which is acting in harmony with the church laws. (Smith vs. Nelson 18 Ver., 511 ; Smith vs. Swormstedt, 5 McLean, 388.) The deeds leave this property as that of the St. Charles Church, independent of any connection. (Miller vs. Gable, 2 Denio, 492 ; People vs.

Steele, 2 Barb., 397; Presbyterian Cong'n vs. Johnston, 1 Watts & Searg, 1; Watson vs. Avery, 2 Bush., [Ky.] 333; State vs. Farris, 45 Mo., 198.) In controversies as to the title to property the edicts of ecclesiastical bodies are not conclusive. (Roberston vs. Bullions, 9 Barb., 134; Natal vs. Gladstone, 3 Law. R. Eq., 1; June Law of Creeds, p. 266; Kniskern vs. Lutheran Church, 1 Sandf. Ch., 439.) The proceedings of the twenty-two were void, because they could not obtain the property of the forty-nine by a violation of church laws. (45 Mo., 183.)

VI. The deed does not require any connection with the General Assembly, the property is conveyed to the First Presbyterian Church of St. Charles; no doctrines are named, no discipline, no form of church government, and there is no implication of such a requirement from the fact that it was once in connection with it. *Expressio unius exclusio alterius;* whatever the parties did not put into their contract they did not intend.

VII. The case of Watson vs. Jones, (13 Wall., 679,) is no authority in this. Not being in construction of federal laws it has no power to conclude this court. This court ought to conform its rulings to its past opinion on all the questions involved. This court held in 45 Mo., 198, that though in ecclesiastical questions the church rulings are conclusive, the rule is different when property is involved. The federal courts have no jurisdiction to reverse this ruling, and if they have done so, this court is not bound. But they have not done so. The facts upon which the Supreme Court ruled that case, admitted there, are denied here.

*Orrick & Emmons,* for Respondents.

I. Civil courts cannot look beyond the decrees of ecclesiastical judicatories and overhaul their decisions. (State *ex rel.* Watson vs. Farris, 45 Mo., 183, and cases referred to. The defendants are no longer members of the First Presbyterian Church of St. Charles, and therefore have no right to the use of the temporalities granted for the use of the congregation. (Den vs. Pilling, 4 Zabr., 653; McGinnis vs. Watson, 41

Penn. St., 1; Robertson vs. Bullions, 9 Barb., 134; German Reformed Church vs. Seibert, 3 Barr., 282; Commonwealth vs. Green, 4 Wharton, 531, 599; Gibson vs. Armstrong, 7 B. Mon., 481; Shannon vs. Frost, 3 B. Mon., 258, 261; Harmon vs. Dreher, 1 Speers Eq., 87, 91; Watson vs. Avery, 2 Bush., 332, 398; Den vs. Bolton, 7 Halst. 206; Harper vs. Straws, 14 B. Mon., 56; Sutter vs. Dutch Ref. Ch., 6 Wright, 503; Sheldon vs. Easton, 24 Pick., 281; Diefendorf vs. Ref. Ch., 20 Johns, 12; Lawyer vs. Cipperly, 7 Paige, 281; Miller vs. Gable, 2 Denio, 492; Gable vs. Miller, 10 Paige, 627; Hadden vs. Chorn, 8 B. Mon., 70.)

II. The action of the General Assembly, synod, presbytery and session, whereby the plaintiffs were recognized as the congregation of the First Presbyterian Church of St. Charles, did not attempt, and did not in fact affect in any manner the title to the property;—the legal title still remains in the trustees,—the use in the congregation. The church courts declare that a certain body of christians constitute the congregation of the Presbyterian Church of St. Charles; that they are in harmony with the church as to doctrine, and submit to its government. This is purely an ecclesiastical matter, proper to be decided by an ecclesiastical court and improper for any other. The true theory is, and the one adopted by this court in the case of Watson vs. Farris, (45 Mo., 183,) that the civil courts will accept as conclusive the decisions of ecclesiastical tribunals upon questions purely spiritual, and where civil rights depend upon an ecclesiastical matter, will take the ecclesiastical decisions out of which the civil right arises as it finds them. (See also Harmon vs. Dreher, 1 Speers S. C., Eq., 87, 121; Shannon vs. Frost, 3 B. Monroe, 261; Robertson vs. Bullions, 9 Barb., 134; German R. Ch. vs. Seibert, 3 Barr., 282.) Here we do not propose to disturb or affect in the least, the legal title, that is in the trustees mentioned in the deeds. We ask to be protected in the use as the congregation designated in the deeds, and invoke the aid of the church in the enjoyment of an ecclesiastical right, our rights as a congregation ecclesiastically having been determined by the church courts.

III. The temporalities in question were granted and dedicated to the use of the congregation of the First Presbyterian Church of St. Charles, in connection with the General Assembly of the United States of America, old school, of which the plaintiffs and defendants were members. The defendants are no longer members of said congregation, and the said plaintiffs are the true successors of the congregation of said church, to which said property was originally granted and dedicated, and are entitled to the exclusive religious use thereof. (Shannon vs. Frost, 3 B. Monroe, 253 ; Miller vs. Gable, 2 Denio, 492 ; Gibson vs. Armstrong, 7 B. Mon., 481 ; Diefendorf vs. Ref'd Church, 20 Johns. R., 12 ; Harmon vs. Dreher, 2 Speers, 87 ; Den vs. Bolton, 7 Halstead, 206 ; Ger. Ref. Ch. vs. Seibert, 5 Barr., 291 ; Watson vs. Farris, 45 Mo., 183.) This last named case settles the question that where a civil right depends upon an ecclesiastical right, the latter must be determined by the ecclesiastical judicatories. It also explains how far and to what extent these judicatories may effect by their decree "property rights." It may be proper to revert to the fact, that in this proceeding the plaintiffs are not insisting upon any change in the title of the property involved. The judgment of the court below simply gives to the plaintiffs the exclusive use of the church property, the legal title remaining in the trustees where it was before this suit was instituted. We insist that the members of the congregation, as such, have no property interest in the real estate ; they as members come and go ; when one leaves the congregation it is not necessary that he should make any conveyance of his property interest. He takes nothing with him and leaves nothing behind him. His right to worship as a member of the congregation is an ecclesiastical right which the Supreme Court says, is subject to be controlled by the ecclesiastical judicatories. Where a civil right depends upon an ecclesiastical right, civil courts will not enter upon an inquiry as to the authority of the ecclesiastical judicatories to take the action they may have taken. This rule we understand the court to have violated in rendering the

decision in this cause, when it questioned the authority of the General Assembly to dissolve synods and presbyteries, &c. The action taken in this regard was the same in the Kentucky case, and the Supreme Court emphatically held that as a civil court here in the United States, where the absolute separation of church and State is one of the corner stones of our free institutions, it will not pass upon such questions.

ADAMS, Judge, delivered the opinion of the court.

This was an action in the nature of a bill in equity, brought by the plaintiffs in the St. Charles Circuit Court, claiming to be the only beneficiaries of certain church property, consisting of a house of worship and a parsonage in the city of St. Charles. They allege that they alone constitute the congregation of the First Presbyterian church of St. Charles, and that the defendants, who at one time formed a part of the congregation, had voluntarily withdrawn from the church, but still held the property, to the exclusion of the plaintiffs. The defendants deny all the allegations of the petition, and charge the facts to be that they and the plaintiffs together constituted the congregation entitled as beneficiaries to the use of the church, up to the time of the dissensions growing out of the action of the General Assembly in its deliverances on the subject of slavery and "*loyalty.*" They deny that they have prevented the plaintiffs from the occupancy of the church jointly with themselves, and charge that the plaintiffs have voluntarily withdrawn and formed an independent congregation. They deny that this independent organization, as such, are beneficiaries entitled to the property in dispute.

The leading facts are, that in the year 1818, a Presbyterian congregation was formed in the town of St. Charles, called and known as the First Presbyterian church of St. Charles. This organization, according to the Confession of Faith and Form of Government of the Presbyterian Church, consisted of persons who had been baptized into the Church and had united together for religious worship. The judicatory of this church was a pastor and two ruling elders, called the session.

Under the constitution of the Presbyterian Church, this congregation, with others, united together and formed a presbytery, called the St. Louis Presbytery, and this presbytery and others formed a Synod, and these presbyteries sent their commissioners to the General Assemby. And so in this way the First Presbyterian Church of St. Charles was a part of, and subject to the control of the General Assembly. This General Assembly divided into two General Assemblies in 1837, known as Old School and New School, and the church of St. Charles became united to the Old School.

The deeds under which the property in dispute is held, conveyed it to trustees, " in trust for the congregation of the First Presbyterian Church of St. Charles." There were two deeds; one made in 1833, and the other in 1857, confirming the title conveyed by the first deed. There is nothing in either deed which requires that the congregation should be under the control of any superior judicatory. The facts, however, show that this congregation continued in connection with the St. Louis Presbytery and the General Assembly (Old School) until it was exscinded in the manner hereinafter set forth.

From the commencement of the late war of rebellion, and during its prevalence, the General Assembly (Old School) at its annual meetings made deliverances on the subject of slavery and loyalty, declaring the obligations of the church in this regard. A large minority of the church, in different States considered these deliverances of the General Assembly unconstitutional; that is to say, that the church, as a church, according to its written Confession of Faith and Form of Government, had no authority to make deliverances on purely political and civil matters. This minority protested against these deliverances, and issued a paper called the " Declaration and Testimony," inveighing against the conduct of the majority. This paper gave great offense to the majority, and they took steps for punishing the offenders, which resulted in an *ex parte* decree rendered by the General Assembly, without the form of trial, declaring in effect that the

accused ministers should not be allowed to sit in any church judicatory higher than the session, and that if they, or any of them, should be enrolled as entitled to a seat by any presbytery, such presbytery should, *ipso facto*, be dissolved, and the members adhering to the General Assembly were thereby authorized and directed to take charge of the presbyterial records, to retain the name, and exercise all the authority and functions of the original presbytery until the next meeting of the General Assembly.

Twenty-two members of the congregation of the First Presbyterian church of St. Charles, being the plaintiffs in this suit, formed a new congregation, with a minister and ruling elders, and betook themselves to another place of worship, leaving the remainder of the congregation, consisting of forty-nine members, a minister and ruling elders, in possession of the church and parsonage. This action was taken by the minority because the majority had expressed their adhesion to the doctrines of the paper known as " The Declaration and Testimony." Both of these congregations sent their respective representatives to the St. Louis Presbytery, which had been formed on the plan directed by the General Assembly by excluding the " Declaration and Testimony members." This presbytery received the delegates sent by the plaintiffs and excluded those sent by the defendants, and made a decree to the effect that the plaintiffs were the real and only congregation composing the First Presbyterian Church of St. Charles, and that the congregation made up of the defendants was not the First Presbyterian Church of St. Charles, or any part of it.

The Circuit Court decreed the property to the use of the plaintiff, excluding the defendants from the same. The defendants appealed to the Sixth District Court, which affirmed the judgment of the Circuit Court, and from this judgment of affirmance the defendants appealed to this court. At the March Term, 1871, this court, then consisting of three judges, reversed the judgments of the District and Circuit Courts, Judge Bliss delivering the opinion of the court. A motion was made for a re-hearing, and this motion was sus-

tained, and the case was set for a re-hearing and continued on the docket for that purpose till the March Term, 1873, when it was re-argued and submitted to the court, and has been under advisement till the present time.

· It is proper to state that the court, under a new constitutional amendment, has been re-organized, with two additional judges; and that, as now organized, it consists of five judges, only one of whom was on the bench when the first opinion was delivered. Although we concur in the result arrived at by the court in its former opinion, the importance of the principles involved demands that the court, as now organized, should briefly present the grounds of its assent, and the points passed on by us.

1. At the threshold of this inquiry, we are met with the startling proposition that, in cases like this, the judgment or decrees of ecclesiastical judicatories are final and conclusive, and that the civil courts have no authority in the premises, except to register these decrees and carry them into execution. It is to be regretted that loose expressions, by elementary writers, and also by judges in delivering their opinions, have given too much foundation for this false doctrine. Even the Supreme Court of the United States, in Watson vs. Jones, 13 Wallace, 679, gives prominence to this idea by making it the chief foundation of their opinion. That court seemed to think the judges not sufficiently learned in ecclesiastical law to pass on such questions, and that the ecclesiastical courts, being better qualified than themselves, ought to be allowed to be the exclusive judges.

The civil courts are presumed to know all the law touching property rights; and if questions of ecclesiastical law, connected with property rights, come before them, they are compelled to decide them. They have no power to abdicate their own jurisdiction and transfer it to other tribunals. If they are not sufficienly advised concerning the questions that arise, it is their duty to make themselves acquainted with them, in all their bearings, and not to blindly register the decrees of tribunals having no jurisdiction whatever over property.

The true ground why civil courts do not interfere with the decrees of ecclesiastical courts, where no property rights are involved, is not because such decrees are final and conclusive, but because they have no jurisdiction whatever in such matters, and cannot take cognizance of them at all, whether they have been adjudicated or not by those tribunals. This principle forms the foundation of religious liberty in Republican governments. The civil authorities have no power to pass or enforce laws abridging the freedom of the citizen in this regard, and hence,.in matters purely religious or ecclesiastical, the civil courts have no jurisdiction.

A deposed minister or an excommunicated member of a church, cannot appeal to the civil courts for redress. They can look alone to their own judicatories for relief, and must abide the judgment of their highest courts as final and conclusive. But when property rights are concerned, the ecclesiastical courts have no power whatever to pass on them so as to bind the civil courts. If they expel a member from his church, and he feels himself aggrieved in his rights of property by the expulsion, he may resort to the civil courts, and they will not consider themselves precluded by the judgment of expulsion, but will examine into the case to see if it has been regularly made upon due notice, and if they find it to be duly made, they will let it stand, otherwise they will disregard it, and give the proper relief. In most cases, no doubt, the judgment will be found to be sufficiently regular to fix the *status* of the expelled member and to warrant the civil courts in denying the desired relief.

2. This controversy had its origin in the deliverance of the General Assembly regarding slavery and loyalty. If this venerable body had no authority in their ecclesiastical capacity, to make the deliverances in question, the subsequent acts of the church judicatories growing out of them, must be treated as nullities, at least as far as property rights are concerned.

It must be conceded on all hands, that questions of slavery and loyalty are merely political and civil, and not ecclesiastical or religious in their nature; and yet it is true as a matter

of fact, that during the late war between the States, the highest judicatories of most of the churches, both North and South of the federal lines, bent before the storm of passion that swept over the country and engaged in the strife by entering upon their records deliverances in aid of their respective civil authorities.

Had these judicatories any power in their ecclesiastical capacities to do this is the question raised by this record for us to decide. The Presbyterian Church has always been considered, and no doubt is, one of the orthodox Protestant churches, and as such forming a part of the spiritual kingdom of Christ upon earth. Christ authoritatively declared that His kingdom was not of this world. His disciples, as such, owe allegiance alone to Him as the great Head of the Church: As citizens of a republic or subjects of a monarchy or empire, their civil allegiance was due to their respective governments. But the kingdom of Christ is wholly independent of civil governments. This spiritual kingdom has existed and continued to flourish for almost nineteen centuries. While civil governments of all kinds have arisen and lived for a season and then crumbled and faded away, the kingdom of Christ has stood amidst the throes of revolutions; and in the sure hope and faith of its subjects, it will stand till the end of time, and spread throughout all the regions of the earth, until every knee shall bow in humble submission to His holy will. As the Presbyterian Church is a part of this spiritual kingdom, it had no right as such to interfere in civil matters. But the Presbyterian Church also has a written constitution which their ecclesiastical judicatories have no authority to violate. They are as much bound by the provisions of this constitution as the supreme law of the church, as the State and Federal governments are by their respective constitutions.

The written constitution of the Presbyterian Church contains this section: "IV. Synods and councils are to handle or conclude nothing, but that which is ecclesiastical; and are not to intermeddle with civil affairs which concern the commonwealth, unless by way of humble petition in cases extraordi-

nary; or by way of advice for satisfaction of conscience, if they be thereunto required by the civil magistrate." (See Confession of Faith, chap. 31, sec. 4, pp. 159-60.)

In explanation of this section, which is found word for word in the Confession of Faith of the Westminster Assembly of divines, the Rev. Robert Shaw, whose work is considered as a standard authority, says:

" While our Confession denounces any Erastian interference in matters purely spiritual and ecclesiastical, it no less explicitly disavows all popish claims, on the part of the synods and councils of the church, to intermeddle with civil affairs unless by way of petition in extraordinary cases, or by way of advice when required by the civil magistrate. Our reformers appear to have clearly perceived the proper limits of the civil and ecclesiastical jurisdiction, and to have been very careful that they should be strictly observed. ' The power and policy ecclesiastical,' say they, ' is different and distinct in its own nature from that power and policy which is called civil power, and appertaineth to the civil government of the commonwealth; albeit they be both of God and tend to one end, if they be rightly used, viz: to advance the glory of God and to have godly and good subjects. Diligence should be taken chiefly by the Moderator, that only ecclesiastical things be handled in the Assemblies, and that there be no meddling with anything pertaining to civil jurisdiction.' Church and State may co-operate in the advancement of objects common to both, but each of them must be careful to act within its own sphere, the one never intermeddling with the affairs that properly belong to the province of the other." (See Exposition of the Confession of Faith, p. 337.)

The meaning of the section commented on by Rev. Robert Shaw seems to be sufficiently obvious from its own language, but this authoritative exposition puts at rest any possible doubt as to its true intent. In my judgment it prohibited the General Assembly from making the deliverances under review; and they are therefore nullities so far as property rights are concerned. In pronouncing upon these deliver-

ances, we impute no intentional wrong to that reverend and learned body of divines; we hold them in the highest esteem, and regard them as incapable of any such thing.

3. But if this act of the General Assembly and the exscinding decree pronounced against the defendants, be treated as within the scope of ecclesiastical authority, such excision surely ought not to have the legal force of cutting off the property rights of the defendants. The penalty decreed against the offending ministers by the General Assembly did not excommunicate them as church members, nor depose them from their ministerial office. They were declared to be incapable of sitting in any church judicatory higher than the session. But they still held their commissions under which they might " Go into all the world and preach the gospel," receive members into the church, and administer the usual rites to that end, and form congregations of Presbyterians for religious worship.

The exscinding decree against the defendants, cut them off in a body from the higher judicatories of the church, but did not excommunicate them, nor in any manner touch them as individual members of the church or congregation. They occupy in that respect precisely the same attitude they did when they joined the church and made up the congregation. At the time the exscinding decree was pronounced they undoubtedly were beneficiaries entitled to the property in dispute. When this congregation was cut off, their property was cut off with them. If they had money in their treasury to pay their minister or other expenses of the church, that money was cut off with them, and still remained their property subject to their disposition; and in like manner the church edifice and parsonage remain theirs as they were before the excision. If this *ipso facto* self-executing decree had the effect of destroying existing property rights, it could only do so by overriding the plain provisions of the bill of rights of our State and Federal constitutions, which declare in substance that no person can be deprived of his property without due process of law; and that private property cannot be

taken for public use without a just compensation; and that means, that private property cannot be taken at all, except for public use and then only on payment of a just compensation. How could the existing property rights of the defendant be transferred from them to the plaintiffs without the form of trial, and without any power in the judicatory to act on such rights? It would seem to be a ridiculous farce to hold that the plaintiffs being a part of the original congregation could separate themselves into a distinct organization and then have themselves declared by an *ex parte* decree the exclusive owners of the property. If that could be done by a part of a congregation, why could it not be done by strangers to the congregation or emissaries from other States erecting themselves into a Presbyterian congregation and then calling themselves by the same name and having themselves pronounced by the Presbytery the only genuine congregation, entitled to the treasure and property of the old congregation. Courts of justice are made to protect parties in the enjoyment of their rights of person and property, and not to destroy them by upholding such contrivances. But the deeds themselves, by which the property in dispute is held, show the rights of these parties. It was to be held for the use of the congregation—that is, for the members of the church composing the congregation. They can only cease to be members by voluntarily withdrawing, or by excommunication. They have not withdrawn, nor have they been excommunicated. They are still Presbyterians of the same faith and forming a part of the original congregation; and as such are entitled as beneficiaries under those deeds to their interest in the property.

I have not considered it necessary to cite adjudged cases in support of the points here discussed. On questions growing out of church dissensions, the authorities are numerous and contradictory and it would be a useless task to try to reconcile them as each depends so much on its own facts and surroundings. Judge Bliss has referred to the main leading cases in his opinion and I am satisfied with his review of them. But Watson vs. Jones, *supra* had not been deter-

mined at the time Judge Bliss filed his opinion. That case is relied on by the learned counsel for plaintiffs as controlling authority and therefore demands our notice.

In the first place this case originated in Kentucky, and was pending in the courts of that State under the name of Fulton vs. Farley, which had been decided by the Court of Appeals under the name of Watson vs. Avery, 2 Bush., 332. The Louisville Chancery Court had possession of the property in dispute, and it was in the hands of a receiver of that court. The Court of Appeals of Kentucky, had also decided the case of Gartin vs. Penick, 5 Bush., 110, and passed on the principles involved in both of these cases. And yet the Supreme Court of the United States, two judges dissenting and the chief-justice not sitting, did not seem to feel any embarrassment in assuming jurisdiction of the case pending in the State Courts and to overrule, two well considered opinions of the Kentucky Court of Appeals. (Watson vs. Avery, 2 Bush., 332, and Gartin vs. Penick, 5 Bush., 110.) I have always understood the law to be that when two courts have concurrent jurisdiction, the one which first assumes jurisdiction has the sole right to decide the whole controversy. Any other rule would lead to insuperable difficulties and conflicts. If the Court of Chancery at Louisville, had possession of the case, as it undoubtedly had, how could the Circuit Court of the United States take jurisdiction of the same case, simply because some of the beneficiaries lived in another State? The residence of the parties is sufficient to give the Federal courts jurisdiction where nothing intervenes to prevent it. But can a Federal court oust the jurisdiction of a State Court which has already attached? Can jurisdiction be taken by halves or parts? Must it not go to the whole controversy in courts of chancery, before it can attach at all? How can a decree rendered in a Federal court in this sort of case nullify the decree of the State Court? It can only be done by blotting out what little remains of the vestiges of State rights.

But if the Federal Supreme Court had any jurisdiction, it was certainly not superior to the Court of Appeals. In the

light of the law, as I understand it, the Kentucky Court of Appeals was the only court of the last resort in those cases. Where the jurisdiction of the Federal Courts grows out of the residence of the parties, they act as auxiliary to or in aid of the State Courts. Therefore, the Federal Supreme Court in Watson vs. Jones, cannot be regarded in the light of a court of last resort. In fact it was its duty under the law to be controlled by the principles which had been decided by the Court of Appeals, and to register its decrees instead of those of the ecclesiastical tribunals. If we allow the decrees of ecclesiastical tribunals to affect property rights, surely such courts in the State of Kentucky are inferior to the Court of Appeals, which is the only court of last resort in that State and has the right to pass ultimately upon the judgments of all the inferior tribunals. "No good lawyer can entertain any doubt that the church courts are to be regarded as subordinate in all respects and wholly dependent upon the rules of law established by the decisions of the highest State tribunals. The extent of the jurisdiction of all inferior courts must be dependent upon the final decision of the Courts of Appeals. Any other rule must lead inevitably to intricable confusion." As the Court of Appeals in Kentucky is the only court of last resort in this class of cases, its opinions ought to be regarded as better authority than those of the Federal Supreme Court. Besides, in point of talents and ability, the Kentucky Court of Appeals deservedly stands high, and its opinions in the cases referred to are supported by a weight of reasoning which the Federal Supreme Court did not seem able to overturn.

For these reasons I do not consider the case of Watson vs. Jones sufficient authority to control the action of this court.

Judgments reversed and petition dismissed. The other judges concur, except Judge Wagner, who dissents. Judge Napton was not present at the argument, but concurs in this opinion.

WAGNER, Judge, dissenting.

I am unable to distinguish this case from Watson vs. Farris,

(45 Mo., 183) and Watson vs. Jones, (13 Wall., 679), and believing as I do that those cases assert correct expositions of the law, I am therefore constrained to dissent from the opinion above announced.